Mona BRONSON, et al., Plaintiffs,

v.

BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF CINCINNATI, et al., Defendants.

Kathleen HENSON, et al., Plaintiffs,

v.

BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF CINCINNATI, et al., Defendants.

Nos. C-1-74-205, C-1-82-669.

United States District Court, S.D. Ohio, W.D.

Sept. 24, 1982.

na, NAACP Litigation Office, Cincinnati, Ohio, Leonard D. Slutz, Wood, Lamping, Slutz & Reckman, Cincinnati, Ohio, Solvita McMillan, Cleveland, Ohio, for plaintiffs.

John A. Lloyd, Jr., Nancy A. Lawson, Glenn Weissenberger, Cincinnati, Ohio, for defendant City of Cincinnati School Dist.

A. David Nichols, Metzger, Phillips & Nichols Co., LPA, Cincinnati, Ohio, Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for State of Ohio, Special Counsel to Attorney General, State of Ohio, represents State Bd. of Educ.

Gary E. Brown, Richard W. Ross, Asst. Attys. Gen., Columbus, Ohio, for defendants William J. Brown, Atty. Gen. and James A. Rhodes, Governor.

James W. Farrell, Jr., Mark A. Vander Laan, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for defendants Deer Park City School Dist., Madeira City School Dist., Mariemont City School Dist., North College Hill City School Dist., Norwood City School Dist., St. Bernard-Elmwood Place City School Dist., Reading Community City School Dist.

Bruce I. Petrie, John B. Pinney, Graydon, Head & Ritchey, Cincinnati, Ohio, for defendant Indian Hill Exempted Village School Dist.

George E. Roberts, III, Ennis & Roberts, Cincinnati, Ohio, for defendant Lockland City School Dist.

Michael E. Maundrell, Rendigs, Fry, Kiely & Dennis, Cincinnati, Ohio, for defendant Princeton City School Dist.

Lawrence McTurnan, McTurnan & Meyer, Indianapolis, Ind., for defendants Finneytown Local School Dist., Forest Hills Local School Dist., Northwest Local School Dist., Three Rivers Local School Dist., Hamilton County School Dist.

John C. Elam, Suzanne K. Richards, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for defendant Wyoming City School Dist.

James W. Harper, Cincinnati, Ohio, for defendant Oak Hills Local City School Dist.

Thomas I. Atkins, Teresa Demchak, NAACP Special Contribution Fund, New York City, William Caldwell, Elizabeth McKanna, Ratner & Sugarmon, Memphis, Tenn., William Caldwell, Elizabeth McKan-

Arnold Morelli, Bauer, Morelli & Heyd, Cincinnati, Ohio, for defendant Green-Hills Forest Park City School Dist.

William E. Santen, William B. Singer, Santen, Santen & Hughes Co., LPA, Cincinnati, Ohio, for defendant Sycamore City School Dist.

Thomas L. Conlan, Stanley A. Hirtle, Cincinnati, Ohio, for plaintiffs in No. C–1–82–669.

DECISION AND ENTRY OVERRULING MOTION FOR PRELIMINARY INJUNCTION IN CASE NO. C–1–82–669; FIRST CLAIM FOR RELIEF, BASED ON DENIAL OF PROPERTY RIGHTS WITHOUT DUE PROCESS OF LAW, IN CASE NO. C–1–82–669, DISMISSED; PORTIONS OF THIRD CLAIM FOR RELIEF, BASED ON NATIONAL ORIGIN DISCRIMINATION AGAINST LOW INCOME PERSONS AND/OR APPALACHIANS, IN CASE NO. C–1–82–669, DISMISSED; FINDINGS OF FACT AND CONCLUSIONS OF LAW; CONFERENCE CALL SET IN CASE NO. C–1–82–669 TO DETERMINE FURTHER PROCEDURES

RICE, District Judge.

I. *Introduction*

On July 7, 1982, Plaintiffs, individually, and on behalf of their minor children, filed the within action against the Board of Education for the City of Cincinnati School District (hereinafter Board) and its members, requesting that the Court grant a preliminary and permanent injunction restraining the Board from closing Peaslee School, a predominantly Black school located in the Over the Rhine district in Cincinnati, Ohio. Specifically, Plaintiffs alleged that the Defendants had violated 42 U.S.C. § 1983 by depriving them of a property interest without due process of law, and by failing to accord equal protection to low income Blacks and Appalachians. In addition, Plaintiffs maintained that the Defendants had violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. by discriminating against Plaintiffs on the basis of race and national origin, and, that the Defendants' action in closing Peaslee School constituted an abuse of discretion under the law of the State of Ohio.

On August 13, 1982, Plaintiffs filed a motion for a preliminary injunction to restrain the Defendants from closing Peaslee School until further order of the Court. Defendants then filed a motion to dismiss the Complaint, or, in the alternative, certain parts thereof, on August 16, 1982. Therein, the Defendants contended that the Complaint should be dismissed in its entirety because Plaintiffs' allegations of irreparable harm were insufficient as a matter of law. Defendants also requested, in Part B of their memorandum, that the Court dismiss the First Claim, which had been premised upon a denial of property rights without due process. In support of this request, Defendants contended that because no right to attend a particular school, or the school of one's choice, has been conferred upon Plaintiffs under Ohio law, no due process claims based upon such an interest could be said to have arisen. As a final matter, in Part C of their memorandum, Defendants requested that the Court dismiss that portion of the Third Claim which asserted a violation of the rights of Appalachian and low income students under 42 U.S.C. § 2000d. With regard to this claim, the Defendants contended that since Appalachians and low income persons were not within those classes 42 U.S.C. § 2000d was designed to protect, the Appalachian or low-income Plaintiffs lacked standing to assert violations of that statute.

On August 20, 1982, Plaintiffs filed a Memorandum in Opposition to Defendants' Motion to Dismiss, in which they responded only to those matters raised by that portion of Defendants' motion which requested dismissal of due process claims based upon a property interest. Specifically, Plaintiffs contended, without supporting authority, that assignment to a particular school creates a property interest in attending that school. Defendants then filed a response to the Plaintiffs' request for a preliminary in-

junction on August 23, 1982, and on August 24, 1982, Plaintiffs' motion came on for hearing before this Court, at which time the Court received testimony from: Reverend Holmes, the head of a Cincinnati coalition of religious denominations formed to work on social concerns; Dr. James Jacobs, the Superintendent of the Cincinnati Public School System; Board members Herbert Brown and Robert Braddock; Reverend Melvin Jones, the chairman of the 1981 Task Force appointed by the Board to study school closings; Plaintiffs Hibbard, Leary and Henson; and finally, Michael Maloney, a city planner who had previously served as the Director of the Urban Appalachian Council, a group formed for the purpose of documenting the social conditions and needs of Appalachian residents in the Cincinnati area. Plaintiffs also offered various exhibits, most of which were admitted, without any objection from the Defendants.[1]

■ After the Plaintiffs had completed the presentation of their case, the Defendants renewed their motion to dismiss, based on the grounds which had been set forth in the motion previously filed. The Court then heard argument from the parties, and indicated that it would take the matter under advisement. On Monday, August 30, 1982, the Court informed the parties that it would deny the Plaintiffs' motion for a preliminary injunction based on the fact that under the test for injunctive relief specified in *Roth v. Bank of the Commonwealth*, 583 F.2d 527 (6th Cir.1978), *cert. dismissed*, 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979) (*Roth*), Plaintiffs had failed to establish either a likelihood of success on the merits, or that they would suffer any harm, let alone irreparable harm. In addition, the Court indicated that it intended to sustain Defendants' motion to dismiss, at least insofar as that motion was predicated upon the non-existence of a property interest in attendance at a particular school. (Plaintiffs' First Claim for Re-

lief). Because Fed.R.Civ.P. 52(a) requires specific findings of fact and conclusions of law upon refusal to grant interlocutory injunctions, the Court will first set forth its legal and factual findings with regard to the request for injunctive relief, and will then follow with a brief discussion of those matters raised by the Defendants' motion to dismiss. Before engaging in the above analysis, however, one additional point should be made regarding the effect of the Court's conclusions either upon the trial on the merits in the within action, or upon the trial in *Mona Bronson, et al. v. Board of Education of the Cincinnati School District of the City of Cincinnati, et al.*, Case No. C–1–74–205, with which the present action has been consolidated. Because the preliminary injunction herein was not consolidated with the trial on the merits, and because the nature of findings made in connection with a preliminary injunction are inherently tentative, it is apparent, under established authority, that findings made on motions for preliminary injunctions do not estop the parties at the trial on the merits, and are neither determinative of the issues in the case, nor binding upon the parties or the Court at a subsequent trial. *See, e.g., Diversified Mortgage Investors v. U.S. Life Title Ins. Co. of New York*, 544 F.2d 571, 576 (2d Cir.1976); *Bursten v. Phillips*, 351 F.2d 616 (9th Cir.1965); *NLRB v. Acker Industries, Inc.*, 460 F.2d 649, 652 (10th Cir. 1972); and *Industrial Bank of Washington v. Tobringer*, 405 F.2d 1321, 1323–1324 (D.C. Cir.1968). Accordingly, with the above comments firmly in mind, the Court now turns to consideration of the factual and legal matters pertinent to resolution of the Plaintiffs' request for injunctive relief.

## II. *Findings of Fact*

1. Plaintiffs Pat Hibbard, Everlene Leary, and Kathleen Henson reside in the Peaslee School District, and have children

---

1. Defendants objected to the admission of Plaintiffs' Ex. T, CC, GG, and HH, but the Court reserved a ruling on the admissibility of these exhibits pending the cross examination of Plaintiffs' Appalachian expert, Michael Malo-

ney. In view of the Court's determination that no further hearing on the preliminary injunction would be necessary, all of the above exhibits have been deemed to be admissible.

who have attended Peaslee School or would be eligible to attend Peaslee School in September, 1982. Plaintiff Hibbard is of Appalachian descent; Plaintiff Leary is black.

2. Defendant Board of Education, City of Cincinnati School District, is an elected administrative body organized under the laws of Ohio to administer and operate Public Schools in the City of Cincinnati, Ohio. (Complaint ¶ 9; Amended Answer, ¶ 4).

3. Defendants Robert L. Braddock, Herbert R. Brown, Virginia K. Griffin, Lorena M. O'Donnell, John F. Rudy, G. David Schiering, and Mary T. Schloss are members of the Board of Education, City of Cincinnati School District, and are charged by law with the administration and operation of Public Schools in the City of Cincinnati School District. (Complaint ¶ 10; Amended Answer, ¶ 4).

4. Peaslee School is a primary school located at 215 East 14th Street, Cincinnati, Ohio, within the Cincinnati neighborhood known as Over the Rhine. The Over the Rhine area is located immediately north of downtown Cincinnati in an area roughly bounded by Central Parkway on the South and West, Reading Road on the East, and the lower hillsides adjoining McMicken Avenue and Liberty Street on the North. The Peaslee School District has historically coincided roughly with the southeastern portion of Over the Rhine. (Complaint, ¶¶ 5, 6; Amended Answer, ¶¶ 5, 6).

5. In the 1981–82 school year, 226 students attended Peaslee School. Of these, 185 students, or 81.9% were black. With regard to percentage of Appalachian students, Peaslee is listed in a document prepared in 1973 by the administrative staff of the Cincinnati Public Schools as having contained 3.97% Appalachian students. (Complaint, ¶ 15; Amended Answer, ¶ 8; Plaintiffs' Ex. V).[2]

6. Appalachians are defined generally as persons born, or whose parents were born in one of the three hundred ninety-seven counties designated by Congress in the Appalachian Regional Development Act of 1965. Appalachians as a group share certain characteristics, including family structure, religion, and neighborhood structure. Appalachians do not have a common national origin other than that which they share with the general population of this country.[3]

7. Since 1977, the Board of Education has sought and received the advice of the citizens of the school district with respect to school closings and consolidations. In 1977, 1978 and 1981 community task forces were established by the Board to study the matter of school closings and consolidations and make recommendations to the Board as to which schools to close.

8. On January 12, 1981, the Cincinnati School Board adopted Board Policy 3520, which provided as follows:

School Closing and Consolidation

Should it be deemed necessary to close a school facility in the district permanently, the Superintendent will submit recommendations to the Board of Education at

---

2. There is a conflict between the figures contained in Plaintiffs' Ex. Y and Plaintiffs' Ex. CC. Ex. Y, which reflects the Appalachian percentage cited in the main text, was identified by Dr. Jacobs, Superintendent of the Cincinnati School System, and was admitted into evidence without objection. Ex. CC, which was not properly identified by any witness, and is, therefore, deemed to be inadmissible, indicates the estimated percentage of Appalachian students in Peaslee in 1973 to be approximately 15%. Even if this document had been admissible, and had reflected an accurate percentage of Appalachian students, it would not have altered the Court's conclusions herein, for reasons which will later be set forth. See, footnotes 4, 7, and 8, infra.

3. The definition of Appalachians was taken from the testimony of Michael Maloney, who was qualified, in the Court's opinion, as an expert on Appalachian affairs. Although the Court has listed certain characteristics of Appalachians which were claimed to be unique by Maloney, it should be noted that Maloney failed to explain in precisely what manner the family or neighborhood structure, and religion of Appalachians differ from those of any other group. Thus, the probative value of this testimony is slight, and can be said only to indicate that Appalachians do differ in some unspecified manner from other groups.

the end of the school year, on or before June 15. Recommendations will identify specific schools and/or geographic areas in which a building should be closed. Any or all of the following factors may be considered in identifying potential school closings and consolidations:

—Opportunities for Educational Improvement

—Student Enrollment and Building Capacity

—Operation Costs

—Site Location and Condition

—Physical Education and Athletic Facilities

—Quality of Environment

—Reassignment of pupils can be made in such a way that it will improve racial balance/distance to alternate facilities. The Board of Education shall hold public hearings on the Superintendent's recommendations for school closings and consolidations to provide opportunities for community or individual input and submissions of alternate suggestions. Schools to be closed or consolidated, except in the case of unforeseen emergencies, e.g., catastrophic damage, State directive, etc. will be designated by the Board on or before December 1 prior to the school year of implementation

(Plaintiffs' Ex. A, p. 515).

9. On June 8, 1981, the Superintendent reported to the Board that due to a decline in student enrollment, the School District had excess building capacity. As a result of the underutilization of school facilities, the Superintendent recommended that additional school closings be effectuated for the 1982–83 school year, including the closing of at least one elementary school in the eastern half of the School District and one elementary school in the western half of the School District.

10. On June 8, 1981, the Board of Education established a Citizens Advisory Task Force on School Closings and Consolidations to study school closings for the 1982–83 school year. Among the criteria which the task force was charged to apply were two directly related to the matter of race: (a) the racial balance of the pupil population would be improved where possible but in no event should racial balance be adversely affected, and (b) the burden of school reorganizations and consolidations would not fall on any one race of students disproportionately.

11. On November 23, 1981, the Citizens Advisory Task Force on School Closings and Consolidations presented its preliminary report to the Board of Education. The task force found that the elementary schools had 22% unutilized capacity and, thus, more consolidation was needed to optimize the use of tax dollars. To this end, the task force recommended, among other things, the closing of both the Peaslee Primary and Riverside-Harrison Elementary schools, the reassignment of the Peaslee students to Rothenberg and Washington Park and the reassignment of the Riverside-Harrison students to Oyler. (Plaintiffs' Ex. A, pp. 509–511).

12. In recommending preliminarily that Peaslee School be closed, the Task Force listed the following considerations:

(a) Peaslee's enrollment is very low. The building is a converted annex and is not designed as a complete school facility. The principal's office, resource center, cafeteria and gym/auditorium are all make-work arrangements.

(b) Rothenberg has a better facility which can easily accommodate the Peaslee students. Rothenberg has a number of special programs and is actively supported by the Recreation Commission and the Health Department. The parents' support is very strong. Rothenberg is only three blocks from Peaslee and provides a good educational environment.

(c) Washington Park is only six blocks from Peaslee and historically has had a very good educational program and environment.

(d) This consolidation will not adversely affect racial balance.

(Plaintiffs' Ex. A, p. 511).

13. The Task Force noted that time constraints had prevented extensive communi-

ty participation in its deliberations and recommendations, and advised that in studying the report, the board hold meetings in those communities affected by the preliminary recommendations. (Plaintiffs' Ex. A, p. 510).

14. The Citizens Advisory Task Force on School Closings and Consolidations, in making its recommendations, indicated that it had utilized the following criteria, among others: (a) elementary schools should have a minimum of 300 students to provide the basis for a fine instructional program; (b) actual student enrollment; (c) building capacity; (d) current educational programs and opportunities to improve education; (e) racial balance; (f) alternative programs in effect and that may be introduced; (g) cost per pupil; (h) parent and community involvement; (i) age, condition and location of the building and site; (j) operating and maintenance costs; (k) physical education and athletic facilities; (l) previous consolidations by the board; (m) transportation problems; (n) traffic conditions; and (o) real estate value of the closed buildings. (Plaintiffs' Ex. A, pp. 510, 514).

15. The Task Force report also noted that 26 schools had been visited, and stated that:

> While the school administration provided statistical data, there was no input whatsoever that identified specific schools to be considered for consolidation. The recommendations contained herein are the result of a totally independent analysis and evaluations by members of the Task Force.

(Plaintiffs' Ex. A, p. 510).

16. During the November 23, 1981 meeting in which the Task Force Preliminary Report was received, the Board voted to suspend the December 1 time restraint contained in Board Policy 3520. Although that provision required the designation of schools to be closed by December 1 of the year prior to implementation of the closures, the Board suspended the deadline in order to permit itself time to make a final decision with regard to the Preliminary Report of the Task Force. (Plaintiffs' Ex. A, pp. 515, 518).

17. Subsequent to submission of the Preliminary Report, public meetings were held in all four schools scheduled to be closed. On December 3, 1981, a public hearing was held at Peaslee School regarding the proposed closure. Approximately one hundred persons attended this meeting, including members of the School Board and the Citizens Task Force, Plaintiff Kathleen Henson, and Dr. Jacobs, the School Superintendent.

18. On January 11, 1982, the Citizens Advisory Task Force on School Closings and Consolidations submitted its final report to the Board of Education. The task force failed to reach a consensus on specific school closings for the 1982–83 school year. Rather, the task force recommended that it be given additional time to study school closings and to issue a report on school closings and consolidations for the 1983–84 school year by November 1, 1982. (Plaintiffs' Ex. B, p. 31).

19. The Task Force Final Report was critical of several portions of the Board Policy 3520, most notably the time constraints it placed upon the Task Force, and made the following comment with respect to the preliminary report:

> The Task Force preliminary report recommends that four schools be closed: Riverside-Harrison, Peaslee, Heinhold, and Crest Hills. If these schools are closed (66%) Black youngsters will be displaced, which is in direct violation with the Facility Committee mandate that "school reorganizations and consolidations will not fall on any one race of students disproportionately." Furthermore, though the schools named fall within the criteria guidelines for closing, it must be asked whether to close them would be fair, given the past record of consolidation programs.

(Plaintiffs' Ex. B, pp. 29, 31).

20. On January 25, 1982, five of the twelve members of the Citizens Advisory Task Force on School Closings and Consolidations who voted on the final task report

submitted their own report to the Board. These individuals recommended that the schools listed for closing in the task force's preliminary report of November 23, 1981, including Peaslee Primary, be closed for 1982–83. (Plaintiffs' Ex. C, p. 16).

21. On January 25, 1982, the Board of Education voted not to close any schools for the 1982–83 school year, and to grant the Citizens Advisory Task Force on School Closings and Consolidations an extension of time, until November 1, 1982, to submit a report on school closings and consolidations for the 1983–84 school year. (Plaintiffs' Ex. C, p. 18).

22. On January 15, 1982, Dr. Jacobs received a memorandum from the treasurer for the school system regarding potential budget problems which could be caused by an anticipated deficit in the State budget. The treasurer indicated that if the predicted State deficit were to be solved entirely by budget cuts, education cuts would amount to approximately 20% from January to June, 1982, and to 16.5% during the 1982–83 fiscal year. The treasurer stated that several issues needed to be discussed quickly, including, *inter alia,* the district's ability to sign an Appropriation certificate by March 31, 1982, and alternatives to deal with possible State budget cuts, *e.g.,* local budget cuts, resort to the State loan fund, and a tax levy. (Plaintiffs' Ex. P)

23. Between January and March, 1982, meetings were held throughout the City with regard to the budget problem. On March 22, 1982, the Superintendent presented alternatives to the Board on how the anticipated budget deficit might be met. The alternatives which were presented were based on potential deficits ranging from 3.6–24 million dollars, and did not include school closings. With respect to school closings, the Superintendent's message said:

> Conspicuous by its absence in first level program cuts is school closings. I have not included this item because the Board voted not to close any schools in 1982. But that decision was made prior to the fiscal crisis we are now facing, thus the Board may wish to reconsider this possibility as I have. I now believe we should close some schools in September, 1982, even though our planning and implementing timelines are short. Recognizing the crisis and our declining enrollment, we cannot afford the overhead involved in operating more schools than are needed. Our long-range plan will indicate how many additional schools will be closed each year for the next five years as enrollment declines.

(Plaintiffs' Ex. F, pp. 128–129)

24. Dr. Jacobs did not include school closings in the suggested budget cuts because the Board had previously voted not to close schools. Jacobs felt that the budget plans suggested to the Board were feasible but were not the best plans which could be devised. With a freer hand in closing schools, Jacobs felt that he could improve the deficit plans.

25. Pursuant to Jacobs' suggestion, the Board voted on March 29, 1982: to suspend Board Policy 3520 for twelve months; to rescind the January 25, 1982 motion that no schools be closed; and to direct the Superintendent to report by March 29, 1982 on potential school closings. (Plaintiffs' Ex. D)

26. Had the Cincinnati School District not signed the State Appropriations certificate by March 31, 1982, it would have been required to seek funding under the State Loan Fund. As a result of such an action, certain conditions would have been imposed upon the School District, including a requirement that all expenditures be reduced to state minimum standards. This would have to be accomplished by eliminating all services such as aides, which were not mandated either by state statute or by administrative regulations. In addition, participation in the State Loan Fund would have required the closure of small schools such as Peaslee, which did not conform to the state rule dictating at least fifteen classes per school. The school district was aware of the conditions attached to funding under the State Loan Fund because such a possibility, i.e., of using the State Loan Fund, had been investigated in the past.

27. On March 30, 1982, the Superintendent recommended various program cuts, which were intended to account for 1.5 million dollars of the anticipated budget deficiency. At the time of these recommendations, the precise amount of the predicted decrease in state funding was still unknown. Included in the 1.5 million dollar program cuts were, *inter alia,* the closure of Peaslee and Riverside-Harrison Schools in June, 1982, and the closure of Washington School in January, 1983. The Superintendent indicated that these actions would save $80,000.00 and $430,000.00 in operating costs in 1982 and 1983 respectively, and would produce a savings of approximately $650,250.00 in deferred/pending maintenance. The Board approved the recommendations of Superintendent Jacobs. (Plaintiffs' Ex. E, pp. 151–152, 158).

28. In his report to the Board, the Superintendent noted that "[t]he total number of students directly affected by the three closings would be 1,125 pupils of which 45.07% are Black." (Plaintiffs' Ex. E, p. 152).

29. Representatives from the Peaslee School community and other interested citizens have attended each public meeting of the Board of Education since the March 30, 1982 decision of the Board to close Peaslee. These individuals were afforded the opportunity to address the Board and to present their reasons for keeping Peaslee open. Had it not been for the fiscal crisis caused by the anticipated deficit in the State budget, Peaslee School would not have been closed, at least for the 1982–83 school year.

30. According to documents prepared by Superintendent Jacobs' administrative staff, of the total number of students affected by school closings and boundary changes since 1979, 57.42% were black, and approximately 42.58% were white. The percentages of black pupils in the City of Cincinnati School system during the relevant time period were as follows: 1978–79, 55.15%; 1979–80, 56.25%; 1980–81, 57.33%; 1981–82, 57.23%. (Plaintiffs' Ex. K, L, M, N and U).

31. In documents prepared by the administrative research branch of the Cincinnati Public Schools, the percentages of black students in the two schools closed for 1982–83, i.e., Peaslee and Riverside-Harrison, were listed at approximately 81.86% and 6.64%, respectively. (Plaintiffs' Ex. N, p. 3).

32. Students who would have been eligible to attend Peaslee during 1982–83 will be reassigned to Rothenberg Elementary School, or Washington Park Elementary School. Because Peaslee only contains grades kindergarten through three, the students attending Peaslee have in the past been assigned to Rothenberg after completing third grade at Peaslee.

33. Results of standardized achievement tests are one of many measures of the quality of schools, but are not the only indication of quality. According to statistical data compiled by the Cincinnati Public Schools, achievement of students in Rothenberg and Peaslee was similar for the years 1981 and 1982. For the year 1981, 25.6% of Peaslee students and 14.4% of Rothenberg students were listed as being at or above the national median in reading. For the year 1982, the percentages in reading were listed as 19.3% and 29.1% for Peaslee and Rothenberg, respectively. In mathematics, for the year 1981, the percentages of students listed as being at or above the national median for Peaslee and Rothenberg are 28.2% and 10.2%, respectively, while for 1982, the same figures are 30.1% and 18.6%, respectively. From 1981 to 1982, Rothenberg students were listed as having attained achievement gains in normal curve equivalents in reading and mathematics of + 3.7 and + 2.0, respectively. During the same time period, the achievement of Peaslee students declined in reading and mathematics, on a basis of − 7.3 and − 1.4, respectively.[4]

4. It should be noted that the only testimony furnished by Plaintiffs on the subject of test scores and the relative achievement of the two schools in question was that elicited during the examination, as if on cross, of Dr. Jacobs, the school superintendent. Dr. Jacobs, who was

34. The closing of Peaslee School and the transfer of Peaslee students will not disrupt the Peaslee students who will be assigned to Rothenberg and Washington Park Elementary Schools.[5]

35. Since 1965, the Cincinnati Public School System has been conducting surveys of its teaching staff, in which the staff is asked to evaluate various aspects of each school's program. The 1982 results for Peaslee and Rothenberg indicate, with regard to student freedom from physical threat, ratings on a seven point scale of 4.14 and 4.68, respectively.[6]

deemed by the Court to be an expert in such matters by virtue of his specialized training in educational testing, interpreted the test data as indicating that Peaslee and Rothenberg students had shown similar educational achievement. Since there has been no indication otherwise by relevant testimony, the Court must conclude that Plaintiffs have utterly failed to prove any distinction between the educational programs at Peaslee and Rothenberg, or to establish that any harm will be caused by the transfer of the Peaslee students to Rothenberg.

Another observation which is pertinent concerns Plaintiffs' contentions regarding the quality of the school program at Peaslee and the high achievement levels of its students. *See,* Complaint, ¶ 20. The Court has not considered this point in ruling upon the harm to be caused by the closure of Peaslee School, since no testimony was presented to indicate the significance of percentage differences in achievement. It is interesting to note, however, that of the 61 elementary schools in the Cincinnati Public School system, 46 of those schools exceeded Peaslee's percentage in 1981 of students at or above the national median in reading and mathematics. Likewise, in 1982, 55 of 60 schools exceeded Peaslee's reading percentage, and 47 of the 60 exceeded its mathematics percentage. *See,* Plaintiffs' Ex. X, pp. 9–11 and Plaintiffs' Ex. N, pp. 2–4. Given these figures, it would be difficult to conclude, regardless of the meaning of percentage variations, either that Peaslee School students obtained "high" achievement scores, or that the school's program differed positively in quality from other schools in the Cincinnati Public School System.

Moreover, to the extent that ¶ 20 of the Complaint alleges that Peaslee's achievement levels are not duplicated by schools serving similar communities, several points could be made. First, Plaintiffs have failed to provide any evidence regarding what other communities in the Cincinnati school district are comparable to Peaslee. Second, *assuming arguendo* that similar means "with a percentage of black students in excess of the systemwide percentage," the statistics which have been submitted indicate that in 1981 and 1982, a majority of the Cincinnati Public Schools with such a proportion of black students possessed reading and mathematics achievement levels in excess of those at Peaslee. *See,* Plaintiffs' Ex. X, pp. 9–11 and Plaintiffs' Ex. N, pp. 2–4.

On the other hand, if the assumption is made that similar means "communities with an Ap-

palachian population," several additional points are in order. First, as has been previously noted, the percentage of Appalachian students in Peaslee school does not even begin to approximate the systemwide average as calculated almost ten years ago in 1973 on the basis of what appears to be suspect data, i.e., the return of informational cards by approximately 55% of the student population. *See,* Plaintiffs' Ex. Y. Second, it might be questioned what reliance should be placed upon nine year old data, given the necessarily fluctuating nature of the composition of public school enrollment. *See, e.g.,* Plaintiffs' Ex. K, which indicates an increase in black pupil enrollment in the ten year interval from 1968–69 to 1978–79 of approximately 12%. Assuming that Peaslee could be classified as an Appalachian school, and further assuming that the Court would be willing to accept a data base which has not been demonstrated to be reliable, it would appear that of the 25 elementary schools which contain over the 1973 systemwide percentage of Appalachian students, the achievement scores of Peaslee students ranked below between 18 and 24 of the 25 schools, depending upon the year and subject involved. (It should be noted that the preceding comments were made on the basis of the 17.27% systemwide percentage of Appalachian students which is reflected on Plaintiffs' Ex. Y. This figure conflicts with the systemwide percentage of approximately 32% utilized by Michael Maloney, the Plaintiffs' Appalachian expert, and casts doubt upon the validity of the 1973 survey as well as Maloney's testimony. However, even using the lower 1973 figure as a guideline, it does not appear that Peaslee School students achieved in a manner exceeding or, in fact, equaling that of students at other "Appalachian" elementary schools).

5. Again, the only testimony presented by Plaintiffs regarding disruption to students was that elicited from Dr. Jacobs, the school superintendent. Dr. Jacobs indicated that based on past experience with consolidation of schools, there was little disruption on the part of students. Plaintiffs have not offered any evidence to the contrary, and, therefore, the Court accepts Dr. Jacobs' characterization of the effect of school closings upon pupils.

6. The finding of fact in the main text was based on the testimony of Dr. Jacobs rather than

36. Had it not been for the financial crisis caused by the state budget deficit, the School Board would not have closed Peaslee School. There is no evidence that either the suspension of Board Policy 3520, or the decision to close Peaslee School was made other than in compliance with the rules and regulations of the Board of Education.

37. The Defendants receive Federal funds for the operation of the Cincinnati Public Schools, including Peaslee School. (Complaint, ¶ 22; Amended Answer, ¶ 10).

## III. Discussion

■ In *Roth, supra*, 583 F.2d 527 (6th Cir.1978), *cert. dismissed*, 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979), the Sixth Circuit identified the appropriate approach to be utilized in evaluating motions for preliminary injunctions, by stating that:

"In addition to assessing the likelihood of success on the merits, the Court must consider the irreparability of any harm to the plaintiff, the balance of injury as between the parties, and the impact of the ruling on the public interest."

*Id.* at 537–538, quoting with approval from *Metropolitan Detroit Plumbing & Mechanical Contractors Ass'n v. H.E.W.*, 418 F.Supp. 585, 586 (E.D.Mich.1976). In *Roth*, the Sixth Circuit further indicated that:

"In general, the likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent an injunction [i.e., the greater the potential harm to the plaintiff absent an injunction, the less likelihood of success on the merits which need be shown, and vice-versa]."

583 F.2d at 538, quoting from 418 F.Supp. at 586 (parenthetical material added).

First, with regard to the likelihood of success on the merits, several observations are in order. Because the Court has determined that Plaintiffs' First Claim, *i.e.*, those allegations pertaining to a denial of property without due process, and that portion of the Third Claim which asserts a violation of 42 U.S.C. § 2000d based on national origin

discrimination must be dismissed, it is apparent that there is no potential for successful litigation of those claims. Moreover, the evidence adduced to date regarding the remaining claims in the Complaint has not furnished any type of predicate upon which the Court could safely premise a conclusion that Plaintiffs would succeed on the merits herein.

■ In their Second Claim for relief, Plaintiffs have contended that the Defendants discriminated against low income Blacks and Appalachians for violation of 42 U.S.C. § 1983 by closing Peaslee School. In equal protection terms, Plaintiffs' claim, roughly translated, is that the closing of Peaslee School disproportionately burdened Blacks and low income Appalachians. At the outset, it should be noted that the Court has serious reservations about the validity of any claims which are contingent upon the classification of Peaslee School as an "Appalachian" school. As was noted in the findings of fact, as of the 1981–82 school year, Peaslee was approximately 81.96% Black. The only evidence provided to the Court regarding the Appalachian status of Peaslee indicates that as of 1973, its Appalachian percentage was estimated by the school system to be less than 4%. This figure falls far short of the figures used by Plaintiffs' Appalachian expert, Michael Maloney, to classify schools as "predominantly" or "heavily" Appalachian. Maloney indicated that he classified as "predominantly" Appalachian those schools which were at least 25% Appalachian during the 1970's, and as "heavily" Appalachian those schools which were within five percentage points of the systemwide average of approximately 32%, i.e., those schools which were at least 27% Appalachian. Although the Court has substantial difficulty with classifying schools which do not even meet the systemwide percentage as *predominantly* Appalachian, the Court will accept Maloney's characterization, since it has no other available standard. However, even if Maloney's

---

upon Defendants' Ex. 71, which was identified by Dr. Jacobs as containing the 1982 teacher

survey results for Peaslee and Rothenberg, but which was not admitted into evidence.

standard is used, it is apparent that Peaslee does not fall within the appropriate criteria used to denote either a "heavily" or "predominantly" Appalachian school.[7] In fact, it is significant that Plaintiffs' expert did not classify Peaslee as an Appalachian school.[8] Thus, having been provided with no present evidentiary basis upon which to conclude that Peaslee School could reasonably be considered an Appalachian school, the Court cannot find that Plaintiffs have demonstrated any likelihood of success on the merits of their claim that the Defendants' action in closing Peaslee School impermissibly and disproportionally burdened Appalachian students.

As was previously mentioned, Plaintiffs have also contended in their Second Claim that the Defendants discriminated against them on the basis of race by closing Peaslee School. Since Peaslee did possess a percentage of Black students well in excess of the systemwide average, and could thus appropriately be classified as a predominantly Black school, this portion of the Plaintiffs' claim surmounts the barrier already noted with regard to claims premised on discrimination against Appalachians, *i.e.,* since Peaslee is a predominantly Black school, there could be a possibility that its closure would disproportionately burden black pupils, whereas there is no possibility that closure will burden Appalachian pupils.

■ All parties herein have agreed that in order to establish a violation either of the equal protection clause or of Title VI, 42 U.S.C. § 2000d, it is necessary to prove intentional discrimination. *Compare,* Doc. # 6A, pp. 9–10, with Defendants' Response to Plaintiffs' Motion for Preliminary Injunction, p. 10. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50

L.Ed.2d 450 (1977) (*Arlington Heights*), the Supreme Court stated that:

> [O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." ... Proof of racial discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.

*Id.* at 264–265, 97 S.Ct. at 563, quoting from *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). The Court further stated that:

> Determining whether invidious discriminatory purpose was a motivating factor [in the challenged decision] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it "bears more heavily on one race than another," ... may provide an important starting point....
>
> The historical background of the decision is one evidentiary source particularly if it reveals a series of official actions taken for invidious purposes.... The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. ... Departure from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered by the decisionmakers strongly favor a decision contrary to the one reached.
>
> The legislative or administrative history may be relevant, especially where there are contemporary statements by mem-

---

**7.** Likewise, if the systemwide Appalachian percentage of 17.27% reflected on Ex. Y is used, Peaslee would still not be appropriately classified as an "Appalachian" school.

**8.** As a further indication that Peaslee School does not fit within the category of an Appalachian School as defined by Plaintiffs, attention should be directed toward Plaintiffs' Ex. T, which is a legend for Ex. GG and HH, and was

prepared by Plaintiff Henson under the direction of Maloney, the Appalachian expert. On this legend, school closings between 1970 and 1983 are separated into three categories, i.e., "predominantly Black," "predominantly Appalachian," and "white." On this chart, Peaslee is listed under the category "predominantly Black," rather than under "predominantly Appalachian."

bers of the decisionmaking body, minutes of its meetings or reports.

429 U.S. at 266–268, 97 S.Ct. at 564–565, quoting from 426 U.S. at 242, 96 S.Ct. at 2049 (other citations omitted) (parenthetical material added).

■ After evaluating the evidence thus far presented under the criteria set forth above, it does not appear that Plaintiffs have established a likelihood of success on the merits of their claim that the board acted in a discriminatory fashion by closing Peaslee School. First, it does not appear that the actions of the Board had a disproportionate impact upon Blacks. As noted in the findings of fact, approximately 45.07% of the students affected by the Board's decision to close three schools during the 1982–83 school year were Black. Since Black students at present represent approximately 57% of the total systemwide enrollment, it cannot logically be concluded that the impact of the Board's action bore disproportionately upon Black students.[9] Given the fact that the actions of the Board did not affect Black pupils in a disparate manner, it is not necessary to consider the remaining matters cited above. However, even if disparate impact had been shown, an analysis of the other sources of proof of discriminatory intent identified in *Arlington Heights* does not reveal any invidious discriminatory purpose on the part of the

9. The Court is aware of the Plaintiffs' claim that school closings since 1970 have disproportionately affected low-income Blacks and Appalachians, but has determined, for a variety of reasons, to limit consideration of impact to the year 1982–83, or at the most, to those closings and boundary changes which have occurred since 1979. First, as has been previously indicated, this is not a case involving claims based on discrimination against Appalachians. Second, there has been no showing by Plaintiffs of any nexus between the school closings involved herein and those which occurred in prior years. In this context, it should be noted that the Board had determined not to close any schools during 1982–83, but reversed its position solely because of the financial crisis caused by the anticipated State budget deficits in 1982 and 1983. Thus, the closings involved in this case were linked to, and arose from a single incident rather than being connected to an ongoing policy, or specific plan adopted for school closings. To this extent, the present case differs from *Bell v. Board of Education,* 491 F.Supp. 916 (N.D.Ohio 1980), *aff'd* 683 F.2d 963 (6th Cir.1982), wherein the Court had under consideration a specific plan established in 1975 for the decommissioning of schools. *See, id.* at 940. To the extent that any definite plan for school closings could be said to have been involved herein, it appears to have originated in 1977, when the first Task Force for closing schools was appointed by the Board. This Task Force worked for two years, and its recommendations were generally followed when the Board later closed schools in the school system. The information furnished herein indicates that the school closings and boundary changes from 1979 to 1982 affected black and white students in almost precisely their ratio to total student enrollment. *See,* Plaintiffs' Ex.U. Thus, even if the actions resulting from the first Task Force were connected to the events at issue in this lawsuit, and were considered, they would not reflect a disparate impact upon Black students. The third reason for not considering impact prior to 1982 or 1979, is that Plaintiffs' have submitted no meaningful data regarding closings prior to 1979. Although Plaintiffs' Ex. T and R reflect certain percentages of black and white students in Cincinnati public schools, there is no indication either of the numbers of students affected, or of how the closings affected students in proportion to their representation in systemwide enrollment. Thus, Plaintiffs have, *at this point,* simply failed to tender the requisite proof.

The final reason for not considering evidence of prior acts relates to the Board's present obligation under the law. Until such time as there may be a determination that segregated schooling, "brought about or maintained by intentional state action," *Keyes v. School District No. 1,* 413 U.S. 189, 198, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548 (1973), exists in the Cincinnati Public School system, there is no affirmative duty upon the Board " 'to effectuate a transition to a racially nondiscriminatory school system,' " . . . that is, to eliminate from the public schools within their school system "all vestiges of state-imposed segregation." *Id.* at 200, 93 S.Ct. at 2693, quoting from *Brown v. Board of Education,* 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) and *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275–1276, 28 L.Ed.2d 554 (1971). Thus, while the Board does have the duty to avoid acts which discriminate against or disproportionately burden minorities in violation of the Equal Protection Clause, there is at present no legal mandate that the Board compensate for prior acts, or racial imbalances, and there is a necessary limitation, as well, upon the relevance of such matters when they have no apparent or demonstrated connection to the events at issue in this lawsuit.

Board. First, the historical background of the decision to close Peaslee School, rather than containing a "series of actions taken for invidious purposes," 429 U.S. at 267, 97 S.Ct. at 564, indicates that the Task Force was specifically instructed that closings must not disproportionately burden any one race. When the Task Force expressed reservations about closing the four schools originally targeted in the Task Force Preliminary Report, due to the fact that closure of those schools would disproportionately displace Blacks, the School Board voted not to close any schools during the 1982–83 school year. This decision was subsequently altered because of the State fiscal crisis, but *significantly,* only two of the four schools mentioned in the Preliminary and Final Task Force Reports were closed, and, as has previously been indicated, the result of the total closings for 1982–83 did not disproportionately affect or burden Black pupils.

Plaintiffs have attempted to infer an invidiously discriminatory purpose from the fact that the Board suspended the operation of Board Policy 3520, which provided a list of factors to be considered in identifying potential closings and consolidations, as well as a time frame for designating schools to be closed. Specifically, Policy No. 3520 indicated that the Board should designate schools to be closed by December 1st of the year prior to implementation of closures. The 1981 Task Force did not submit its preliminary report identifying potential schools to be closed in 1982, until November 23, 1981, and accordingly, the Board voted to suspend the December 1 deadline to permit itself time to study and make a decision on the Task Force Report. In addition, the Board held public meetings in the involved communities during December, 1981, in order to elicit public opinion on the proposed closings. These actions appear to be clearly innocuous, and do not raise inferences of any improper motive. Likewise, the second suspension of Board Policy 3520, on March 22, 1982, occurred in response to the fiscal

emergency caused by the predicted State budget deficit, and does not appear to have been the result of invidious motives.

Even if the Board's suspension of Board Policy No. 3520 had appeared to have been something other than an appropriate response to an unanticipated financial crisis, it is significant that the decision to close Peaslee School was made in accordance with the substantive criteria outlined in Policy 3520. In fact, the Preliminary Task Force had applied the factors outlined in Policy 3520, and had concluded that Peaslee School should be closed because of its low enrollment, and because it was not designed as a complete facility, *i.e.,* the cafeteria, gymnasium, resource center, and principal's office were all temporary arrangements. There is no indication that the Task Force altered its opinion regarding the fact that Peaslee School fit the criteria listed in Policy 3520; rather, the Task Force's concern appears to have been the fact that closing all four schools as originally recommended would violate the Facility Committee directive forbidding reorganizations and consolidations affecting any one race disproportionately. Since the Board's action had no such effect, it would appear that this concern was answered. Thus, although the Board did suspend the operation of Board Policy No. 3520, there is no indication that, in fact, the decision to close Peaslee was made other than in accordance with the substantive factors set forth in the Policy, or that "the factors usually considered important by the decisionmaker [would] strongly favor a decision contrary to the one reached." 429 U.S. at 267, 97 S.Ct. at 564–565 (parenthetical material added).

█ Based on the preceding analysis, it is apparent that Plaintiffs have failed to demonstrate any likelihood of success on the merits of their Second Claim for relief, *i.e.,* that the Board's action in closing Peaslee School discriminated against low income Blacks and Appalachians on the basis of race and national origin.[10] As a further

---

10. It should be noted that the Court did not consider claims based on the status of Blacks

and/or Appalachians as low income persons, for the simple reason that *no* evidence was

matter, since Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., embraces the same constitutional standard as does the Equal Protection Clause, *see, Regents of the University of California v. Bakke,* 438 U.S. 265, 286–287, 98 S.Ct. 2733, 2746–2747, 57 L.Ed.2d 750 (1978), it is clear that Plaintiffs also have not established any potential for prevailing on their Third Claim for relief, that is, that Defendants have discriminated on the basis of race and national origin in a program receiving Federal financial assistance.

The fourth and final claim which has been asserted herein is that the Defendants' action in closing Peaslee School constituted an abuse of discretion under the statutes and Court decisions of the State of Ohio. Ohio Rev.Code Ann. § 3313.49 (Page 1971) provides that:

> The board of education of each city, exempted village, and local school district may suspend by resolution, temporarily or permanently, any school in such district because of disadvantageous location or any other cause. Whenever any school is suspended, the board of education of the district shall at once provide for the assignment of the pupils residing within the territory of the suspended school to such other schools as are named by said board.

In *Brannon v. Board of Education,* 99 Ohio St. 369, 124 N.E. 235 (1919), the Ohio Supreme Court stated in its syllabus that:

> A court has no authority to control the discretion vested in a board of education by the statutes of this state, or to substitute its judgment for the judgment of such board, upon any question it is authorized by law to determine.
>
> 3. A court will not restrain a board of education from carrying into effect its determination of any question within its

discretion, except for an abuse of discretion or for fraud or collusion on the part of such board in the exercise of its statutory authority.

*Id.* at 369, 124 N.E. 235. *Accord, Board of Education v. State ex rel. Brown,* 37 Ohio App. 453, 175 N.E. 217 (Ct.App.1930).

■ Therefore, under the law of Ohio, this Court is permitted to determine only whether the board abused its discretion under Ohio Rev.Code Ann. § 3313.49 (Page 1971) by closing Peaslee School. Based on the preceding analysis, the Court cannot conclude that Plaintiffs have demonstrated a likelihood of success on the merits of this claim. Because the Board acted in response to an unanticipated fiscal crisis, and because the decision approved by the Board conformed to all substantive requirements outlined in Board Policy No. 3520, there does not appear, on the basis of the present record, to have been any abuse of discretion by the Board. Accordingly, for all the foregoing reasons, the Court finds that Plaintiffs have failed to establish a likelihood of success on the merits of any of the four claims for relief outlined in their Complaint.

■ Although the preceding conclusion is dispositive of, and fatal to Plaintiffs' request for injunctive relief, the Court will also briefly address the issue of irreparable harm. As was noted in the findings of fact, Plaintiffs have failed to demonstrate that they will be irreparably harmed, or, in fact, harmed at all by the closing of Peaslee School. In view of the only data thus far submitted, it does not appear that Peaslee School provided either an education of higher quality, or an education demonstrably different than that which will be afforded to former Peaslee students at Rothenberg School. Furthermore, even if the statistical

---

submitted regarding the alleged low income status of either Plaintiffs or other residents of the Peaslee School District. This lack of evidence includes the testimony of three of the Plaintiffs, not one of whom indicated that her income, or that of her family, was within the poverty guidelines, or within any standard used to measure low income status. Likewise, Plaintiffs did not present any evidence, either

documentary or testimonial, regarding the general income characteristics of the Peaslee School District. Because the Court cannot, by conjecture or assumption, supply evidence where none has been provided, it must conclude that Plaintiffs have not shown any likelihood of success with respect to claims relating to the status of certain groups as low income persons.

data had indicated otherwise, there is no testimony in the record other than that of Dr. Jacobs, who stated that achievement scores are but one of many measures of the quality of a school, and that consolidation of schools does not disrupt pupils. In any event, it is somewhat difficult to manufacture a finding of irreparable harm based on the fact that elementary school pupils are being transferred to a school which they would eventually have attended anyway. Finally, while Reverend Jones testified that closing schools is a painful process for people in the communities involved, his testimony must be viewed as having fallen far short of demonstrating the type of harm required for injunctive relief. While Plaintiffs and others may feel saddened by the loss of a neighborhood school, there is nothing in the record to distinguish the present situation from that of any community in which a neighborhood school has been closed. Other than Reverend Jones' observation that the process of closing schools is a painful one, Plaintiffs did not present any evidence of the particular harm which would be caused to them or to the Over the Rhine neighborhood. Once again, Plaintiffs have simply failed, at this point, to set forth the requisite amount of proof regarding an essential element of their case for injunctive relief. Accordingly, the Court must conclude that Plaintiffs have not demonstrated the presence of irreparable harm which would result absent the issuance of an injunction.

Given Plaintiffs' complete lack of a showing either of success on the merits, or that they will be harmed without the issuance of an injunction, it is axiomatic that the balance of harm as well as public interest considerations militate in favor of the Defendants, who will obviously suffer disruption in their presently planned budget, i.e., will be injured at least in the amount of the anticipated savings to be generated by the closure of Peaslee, if an injunction is granted. Therefore, having concluded that all of the criteria outlined in *Roth, supra,* 583 F.2d 527 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979) weigh against the issuance of an injunction, the Court will next briefly discuss those issues raised by the Defendants' Motion to Dismiss.

## IV. *Defendants' Motion to Dismiss*

As was previously noted, the Defendant filed a motion to dismiss on August 16, 1982, requesting that the Court dismiss the Complaint in its entirety, due to the absence of any allegations therein of irreparable harm, or in the alternative, that the Court dismiss the First Claim, and that portion of the Third Claim which asserted national origin discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., against Appalachian and low income students. After consideration of the arguments advanced by the parties, the Court has concluded that the Complaint should not be dismissed in its entirety, but that dismissal is appropriate as to the First Claim, as well as to that portion of the Third Claim which pertains to national origin discrimination against low income persons and/or Appalachians.

Defendants have contended that the complaint should be dismissed in its entirety because the allegations of irreparable harm contained therein are insufficient to support entitlement to injunctive relief. While it is true that Plaintiffs *have failed to establish* irreparable harm sufficient to justify issuance of an injunction, the Complaint need not "plead evidence," *Fairchild, Arabatzis & Smith, Inc. v. Sackheim,* 451 F.Supp. 1181, 1188 (S.D.N.Y.1978), and need not contain "specific allegations of irreparable injury ... if the averments as a whole show that this would be the result of the acts complained of." *Pine Township Citizens Ass'n v. Arnold,* 453 F.Supp. 594, 598 (W.D.Pa.1978) (citations omitted). Because the averments in the Complaint herein, if taken as true, could establish the presence of a harm for which no adequate remedy at law would exist, the Complaint may not properly be dismissed on the basis asserted by Defendants. Specifically, since Plaintiffs have alleged that the Defendants' actions will cause irreparable harm by depriving Plaintiffs of educational opportunities

and by disrupting the community fabric of the Over the Rhine area, dismissal of the Complaint would not be appropriate.

In part B of their memorandum in support of their motion to dismiss, the Defendants have contended that the Plaintiffs' First Claim must be dismissed because there is no property interest in attendance at a particular school, to which due process protections attach. Plaintiffs have conceded, in both their Memorandum in Opposition to Defendants' Motion to Dismiss, and during oral argument at the preliminary injunction hearing, that there is no right which has been granted to them under state law to attend a particular school. Plaintiffs nonetheless have maintained, without specifying the source of their property right, that they are entitled to due process protections merely because the Board has chosen to assign them to particular schools in the past.

In *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Supreme Court indicated that:

> [I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States.

*Id.* at 535, 101 S.Ct. at 1913.

In the present case, there is no dispute with regard to the fact that Defendants were acting under color of state law, and, consequently, the first requirement for a § 1983 claim has been satisfied. With respect to property rights, however, the Supreme Court stated in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), that:

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and

that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709. In the present case, the Plaintiffs have not pointed to an independent source, either in the law of Ohio, or otherwise, which has granted to them a legitimate claim of entitlement to attend a particular school. Ohio law does grant to youth of school age a right to a free education, see, Ohio Rev.Code Ann. § 3313.48 (Page 1971), but does not confer a right upon pupils to attend a specific school, even if they were previously assigned thereto. In fact, Ohio law provides to the contrary, by authorizing local boards of education, when schools are suspended for any cause, to assign "pupils residing within the territory of the suspended school to such other schools as are named by the school board." Ohio Rev.Code Ann. § 3313.49 (Page 1971).

Plaintiffs have argued that the right involved herein is similar to that recognized in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (*Goss*), since the harm done to students by school closings can far exceed that caused by a one day suspension from school. Because the latter interest was protected under *Goss,* Plaintiffs have contended that there is likewise a property interest herein which is constitutionally protected. However, the Supreme Court clearly indicated in *Goss* that the relevant consideration for due process purposes is *not* the " ' "weight" ... but the *nature* of the interest at stake.' " *Id.* at 575–576, 95 S.Ct. at 736, quoting from *Board of Regents v. Roth,* 408 U.S. 564, 570–571, 92 S.Ct. 2701, 2705–2706, 33 L.Ed.2d 548 (1972) (emphasis in original). Thus, even if the loss herein should be far more egregious than that involved in *Goss,* that fact is irrelevant to a determination of whether Plaintiffs possess a property interest in attending Peaslee School. While the Court in *Goss* concluded that under Ohio law, there was a legitimate claim of "entitlement to a public education," 419 U.S. at 573, 95 S.Ct. at 735, which might not be abrogated without adherence to due process requirements, Plaintiffs herein have not

claimed that they have been deprived of their access to, or right to attend the Cincinnati Public Schools. Instead, they have claimed that they have a right to attend a particular school without identifying any source of such a right. Given Plaintiffs' failure to assert a property interest which is cognizable, or protected under the laws of Ohio, the Court must conclude that the First Claim in the Complaint is insufficient to satisfy the second element required under § 1983, i.e., that the conduct in question operated to deprive a person of rights secured by the Constitution or laws of the United States. Consequently, Defendants' motion to dismiss the Plaintiffs' First Claim is deemed to be well taken, and must be granted.

The remaining matter which must be addressed concerns the Defendants' request that the Court dismiss that portion of Plaintiffs' Third Claim which alleges that Defendants have discriminated against low income persons and Appalachians in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. In part C of their memorandum in support of the motion to dismiss, Defendants have contended that Plaintiffs do not have standing to seek relief under § 2000d because they are not within one of the classes of persons that statute was designed to protect. Plaintiffs have not responded to this point in their Memorandum in Opposition to Defendants' Motion to Dismiss, and have failed at any point to cite any authority indicating that either Appalachians or low income persons are within the purview of § 2000d. In fact, Plaintiffs have conceded that Appalachians share a national origin common with American citizens generally. *See,* Doc. # 6A, p. 13. Plaintiffs have contended, however, in their Memorandum in Support of Motion for Preliminary Injunction, that Appalachians, at least, should be recognized as an identifiable group similar to other ethnic minorities such as Hispanics, who have historically encountered certain economic and social discrimination. *See,* Doc. # 6A, pp. 13–14. Assuming *arguendo* that Plaintiffs have not abandoned their national origin claims under § 2000d, and, that the Plain-

tiffs' request for recognition as an ethnic group was intended to include Plaintiffs' status under § 2000d, despite their failure to specifically mention that statute in their memorandum, the Court is without power to judicially amend § 2000d in the manner implied, however desirable such an amendment might be.

■ 42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program receiving Federal financial assistance." There is no indication that "national origin" was intended to include Appalachians or to include groups such as Appalachians who do not possess a national origin distinguishable from that of other citizens of the United States. *See, generally,* H.R.Rep. No. 914, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad.News 2355, 2391–2409. In addition, the Court has found no authority construing § 2000d's prohibition of national origin discrimination to include Appalachians. Likewise, there is no authority for including low income or economically disadvantaged persons within the ambit of § 2000d. In fact, the only authority cited to the Court indicates otherwise. *Cf., Martin Luther King Junior Elementary School Children v. Mich. Board of Education,* 451 F.Supp. 1324, 1333 (E.D.Mich.1978) (dismissing § 2000d claims based on economic disadvantage because benefits were not denied on grounds prohibited under § 2000d).

Based on the above reasoning, the Court finds Defendants' motion to dismiss those portions of the Third Claim which relate to discrimination against low income persons and Appalachians to be well taken, and, consequently, those portions of the Third Claim for Relief must be dismissed. Having disposed of all pending matters, except Defendants' contentions regarding the doctrine of laches, which have been rendered moot in light of the denial of injunctive relief, the Court will next set forth its conclusions of law.

### V.  Conclusions of Law

After consideration of the preceding facts and legal authority, the Court has reached the following conclusions of law:

1.  This Court has subject matter jurisdiction over the within action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343;

2.  Plaintiffs do not have a property right under Ohio law to attend a particular school, or the school of their choice, but have only a legitimate claim of entitlement to access to the educational system and to the benefit of a free education provided with public funds;

3.  Plaintiffs have not been deprived of a property interest without due process of law, since they had no property interest in attending Peaslee School;

4.  Appalachians and low income persons are not included within the purview of 42 U.S.C. § 2000d;

5.  Plaintiffs have not established a likelihood of success on the merits of their claim that the Defendants have discriminated against low income Black and Appalachian students in violation either of the Equal Protection Clause of the Fourteenth Amendment, or of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.;

6.  Plaintiffs have not established a likelihood of success on the merits of their pendent state claim that the Board abused its discretion by closing Peaslee School;

7.  Plaintiffs have not demonstrated that they will be irreparably harmed by the closing of Peaslee School;

8.  The balance of harm in the event of an injunction is in favor of the Board rather than Plaintiffs;

9.  Plaintiffs have not established that the issuance of a preliminary injunction restraining Defendants from closing Peaslee School will not injure the public interest;

10.  Plaintiffs' request for a preliminary injunction must be denied, due to the Plaintiffs' failure to establish the requisite predicate for injunctive relief under *Roth, supra,* 583 F.2d 527 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979).

### VI.  Conclusion

Based on the preceding analysis, the Court finds as follows:

1.  Plaintiffs' motion for a preliminary injunction is denied, because Plaintiffs have failed to demonstrate either a likelihood of success on the merits or the presence of irreparable harm, and

2.  Defendants' motion to dismiss the Complaint in its entirety is overruled; Defendants' alternative motion to dismiss is granted with respect to the Plaintiffs' First Claim for relief, and with regard to that portion of the Third Claim for relief which pertains to national origin discrimination against Appalachians and low income persons.

### VIII.  Conference Call Set

The Court and counsel will confer by conference call telephone communication, at 8:30 a.m. on Wednesday, September 29, 1982, for the purpose of determining further procedures to be followed in this case.