METROPOLITAN DETROIT PLUMBING AND MECHANICAL CONTRACTORS ASSOCIATION, a voluntary association, Individually and on behalf of its members similarly situated, et al., Plaintiffs,

v.

DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, et al., Defendants.

Civ. A. No. 6–71469.

United States District Court, E. D. Michigan, S. D.

Aug. 17, 1976.

Robert Battista, Virginia F. Metz, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for plaintiffs.

Robert B. Breisblatt, Gen. Atty., Dept. of HEW, L. Michael Wicks, Asst. U. S. Atty., Detroit, Mich., for HEW, defendants.

David Baker Lewis, Lewis, White, Lee, Clay & Graves, P. C., Detroit, Mich., for City of Detroit Building Authority, Coleman A. Young, et al.

MEMORANDUM OPINION

FEIKENS, District Judge.

The Metropolitan Detroit Plumbing and Mechanical Contractors Association, Donald

P. Green, and the John E. Green Plumbing & Heating Company brought this action against the City of Detroit Building Authority (CDBA) and other defendants, claiming that a requirement that only joint ventures comprised of at least one minority and one majority contractor could bid on the heating, ventilating and air conditioning contract for the Detroit General Hospital (DGH) construction project violated their rights to be free of racial discrimination under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), 42 U.S.C. §§ 1981, 1983, and the due process and equal protection clauses of the fourteenth amendment. Plaintiffs filed this motion for a preliminary injunction, seeking to prevent defendants from letting the contract with the joint venture requirement. This court has had the benefit of oral testimony as well as numerous affidavits and exhibits. While the issues presented are complex and sensitive, and will be far better illuminated by a complete record developed at a trial on the merits, the court has determined for the reasons set forth below that preliminary injunctive relief should not be granted.

There is initially an issue as to the appropriate standard to be applied in ruling on a motion for a preliminary injunction under Federal Rule of Civil Procedure 65(a). While it is clear that the court must in some fashion take into account the merits of plaintiffs' case in weighing the equities, the parties do not agree as to the precise wording of the standard. This dispute is not at all surprising, since "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success." C. Wright & A. Miller, Federal Practice & Procedure, § 2948 at 450 (1973). Within the Sixth Circuit itself, at least two formulations have recently been applied. In *Brandeis Machinery & Supply Corp. v. Barber-Greene Co.*, 503 F.2d 503, 505 (6th Cir. 1974), the court stated:

> In determining whether sufficient likelihood of success exists as one of the necessary conditions to preliminary injunctive relief, the trial court was required to "satisfy itself, not that the plaintiff certainly has a right, but that he

has a fair question to raise as to the existence of such a right." *American Federation of Musicians v. Stein*, 213 F.2d 679, 683 (6th Cir. 1954), *cert. denied*, 348 U.S. 873, 75 S.Ct. 108, 99 L.Ed. 687 (1954).

In *Garlock, Inc. v. United Seal Inc.*, 404 F.2d 256, 257 (6th Cir. 1968), the court expressed the standard in terms of a "probability of success on the trial." *Garlock* was cited with approval by the Supreme Court in *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 n. 16, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).

This apparent disparity in the wording of the standard merely reflects the circumstance that no single factor is determinative as to the appropriateness of equitable relief. In addition to assessing the likelihood of success on the merits, the court must consider the irreparability of any harm to the plaintiff, the balance of injury as between the parties, and the impact of the ruling on the public interest. In general, the likelihood of success that need be shown will vary inversely with the degree of injury the plaintiff will suffer absent an injunction. As stated by Judge Frank in *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953):

> [When] the balance of hardships tips decidedly toward plaintiff . . . it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.

This language was quoted with approval in *Brandeis, supra*, 503 F.2d at 505. It thus appears that the precise wording of the standard for the likelihood of success on the merits is not as important as a realistic appraisal of all the traditional factors weighed by a court of equity. A balancing is required, and not the mechanical application of a certain form of words.

Turning, then, to the likelihood that plaintiffs will prevail on the merits, a host of difficult legal issues is presented. The joint venture requirement was established

by a resolution of the CDBA, which provides in part:

> [T]he CDBA finds that a joint venture affirmative action program is one means of affirmative action with respect to the project to assure that minority contractors shall not be excluded from participation in or be denied the benefits of the work being done by the CDBA with respect to the new DGH project, in accordance with law  .   .   .  .

The resolution further provides:

> Certain construction work remaining on the DGH project will be selectively solicited from joint ventures, and joint ventures only, comprised of at least one minority contractor and at least one majority contractor, where the minority venturer has by contract the right to substantially and significantly participate in each aspect of performance of the work.

In Section II, Paragraph C of Instructions to Bidders, a "minority contractor" is defined as follows:

> Any business entity which is owned in whole or in part (at least 50%) by a member or group of members of an identifiable and normally classified racial minority as defined under Title IX of the Civil Rights Act of 1964, as amended, which or who has been engaged in the performance of construction work in the trade being selectively solicited by the CDBA for at least two (2) years immediately preceding the first date of solicitation of the work or who can exhibit, in the sole discretion of the Owner, a successful record of performance of construction work on a project in the trade being selectively solicited.

In sum, the CDBA has limited the bidding opportunity on this contract to racially mixed joint ventures, for the express purpose of assuring the participation of minority contractors. It is apparent on the face of the resolution that race is a factor in defining the bidding requirements, and that the intent is to benefit businesses owned by racial minorities. Plaintiffs therefore argue that the resolution amounts to an invidious racial classification that must be subjected to strict scrutiny under the equal protection clause.

The difficulty with this argument is that, while race is a factor, the classification itself is not drawn along racial lines. Rather, potential bidders on the contract have been divided into the classes of racially mixed joint ventures and all others. The requirement on its face applies equally to contractors of all races. Single minority contractors as well as single majority contractors, joint ventures made up solely of minority contractors, as well as joint ventures made up solely of majority contractors, are all precluded from bidding. In this sense the classification is racially neutral.

Cases cited by plaintiffs, such as *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964), and *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), are not to the contrary. *McLaughlin* and *Loving* involved criminal penalties for interracial cohabitation and interracial marriage, respectively. While the Court in both cases rejected the argument that no racial classification was established because the statutes applied equally to members of all races, and proceeded to apply the strict scrutiny test appropriate to suspect racial classifications, there are significant differences between those cases and this one. First, the statutes there involved imposed criminal penalties. As the Court noted in *McLaughlin*, 379 U.S. at 192, 85 S.Ct. at 288 "[i]n this context, where the power of the State weighs most heavily upon the individual or the group, we must be especially sensitive to the policies of the Equal Protection Clause   .   .   . ." In contrast, the CDBA resolution imposes a requirement in a purely economic context upon those who seek to participate in a public construction project. The disadvantaged class is not subjected to the punishment or social opprobrium associated with criminal violations.

Second, the statutes in *McLaughlin* and *Loving* sought to regulate matters in the intimate personal lives of individuals, thus impinging directly upon the fundamental rights of privacy and family life of those

affected. *See Loving, supra,* 388 U.S. at 12, 87 S.Ct. 1817. These fundamental rights alone would have been sufficient to trigger the strict scrutiny standard of equal protection review. *Roe v. Wade,* 410 U.S. 113, 152–56, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). No such rights are implicated by the DGH bidding requirement.

Third, there was a legislative animus in both *McLaughlin* and *Loving* that was clearly directed against the minority participant in the prohibited relationship. As the Court stated in *Loving,* the law against interracial marriages was "obviously an endorsement of the doctrine of White Supremacy." 388 U.S. at 7, 87 S.Ct. at 1821. As such, the laws represented the continuation of the very kind of invidious discrimination against black Americans that the fourteenth amendment was designed to eliminate. In the present case, on the other hand, there is no animus directed against a particular race, no continuation of past discrimination, and no attempt to enforce racial separation. Rather, the joint venture requirement is an attempt to bring the races together in a common enterprise, the very antithesis of the separatist, white supremacist legislation struck down in *McLaughlin* and *Loving.*

This court believes that the above distinctions make a crucial difference in deciding whether the joint venture requirement establishes a classification based upon race so as to require the application of strict scrutiny. To be sure, plaintiffs contend that the requirement has a disproportionate racial impact, in that there are more majority than minority contracts in the Detroit area. The burden of the requirement is borne most heavily by the majority contractors, plaintiffs argue, because the excess majority contractors have no minority partners with whom to form joint ventures. Putting aside for the moment the fact that little evidence of the alleged disproportionate impact was introduced by plaintiffs at the hearing, the Supreme Court has recently held that a facially neutral provision does not violate the equal protection clause unless there is a racially discriminatory purpose, even if the effect of the provision is to burden a given racial group disproportionately. *Washington v. Davis,* —— U.S. ——, 96 S.Ct. 2040, 48 L.Ed.2d 597 (June 7, 1976). While the personnel test involved in *Washington* did not use race in any manner, and is thus distinguishable from the joint venture requirement, this distinction is not dispositive. True, race is a factor in the joint venture requirement, but it is not the sole basis of the classification. On its face, the joint venture requirement applies equally to all. As was true with the prospective government employees in *Washington,* contractors of all races must pass the same test in order to bid on the DGH project. It is only in its alleged disparate impact that any racial discrimination may be perceived. Nor has any purpose to discriminate against majority contractors been shown. The court therefore holds that this case falls within the ambit of the rule in *Washington,* and that the strict scrutiny standard does not apply.

Nonetheless, in order for the classification established by the joint venture requirement to pass muster under the equal protection clause, the traditional rational basis test must still be met. Under this standard, plaintiffs have the burden of demonstrating that the classification is not reasonably related to its purpose. *McGowan v. Maryland,* 366 U.S. 420, 425–27, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). The purpose of the requirement, according to the CDBA resolution, is to assure the participation of minority contractors in the DGH construction project. Since only bids from joint ventures with both majority and minority partners are accepted, the requirement is rationally designed to achieve this purpose. The court therefore holds that plaintiffs have not shown a likelihood that the equal protection clause has been violated.

Plaintiffs make the further claim that the joint venture requirement contravenes Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Title VI provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

The regulations issued under this section provide at 45 C.F.R. § 80.3(b)(2):

A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration *which have the effect of subjecting individuals to discrimination because of their race,* color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin. (emphasis added.)

It appears from the regulation that not only purposeful discrimination, as under the equal protection clause, but also criteria which "have the effect" of racial discrimination may violate Title VI. This might reasonably be read to encompass plaintiffs' claim of disparate racial impact. However, on the record developed in this case, it does not appear likely that a case of disproportionate burden can be factually made out. Plaintiffs merely assert that the excess of majority over minority contractors *per se* constitutes a disparate racial impact. This is far too speculative to support a motion for a preliminary injunction. Plaintiffs did not show that serious efforts were made to enter into joint ventures with minority contractors, or that no minority contractors were available to them. The resolution does not exclude them from the bidding; rather, it is their own decision not to seek out a minority joint venture partner that, at least at this stage, excludes them. The court therefore holds that plaintiffs have not shown a likelihood that Title VI has been violated.

Plaintiffs also allege a violation of 42 U.S.C. § 1981, which provides in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .

It is now clear that § 1981 applies to racial discrimination against white persons. *McDonald v. Santa Fe Trail Transportation Co.,* —— U.S. ——, 96 S.Ct. 2574, 49 L.Ed.2d —— (June 25, 1976). *McDonald* dealt with a claim of discrimination against white employees who had been discharged for misappropriating their employer's property while a black fellow employee charged with the same offense was retained. The Court did not have occasion to pass on an affirmative action program of the kind involved in this case, stating:

Santa Fe disclaims that the actions challenged here were any part of an affirmative action program . . . and we emphasize that we do not consider here the permissibility of such a program, whether judicially required or otherwise prompted.

*Id.* at n. 8. This court likewise need not reach the question of the permissibility of affirmative action under § 1981, for, as discussed above, no adequate showing of either racial discrimination or even disparate racial impact has been made. The CDBA resolution gives contractors of all racial groups the same right to submit bids as is enjoyed by white citizens. The court therefore holds that plaintiffs have not shown a likelihood that § 1981 has been violated.

Finally, plaintiffs contend that the joint venture requirement creates an irrebuttable presumption in violation of the due process clause. According to plaintiffs, the presumption is "that all other contractors [except racially mixed joint ventures] are either unqualified to perform the work or are

discriminating in their hiring practices." Memorandum of Law in Support of Plaintiffs' Request for a Preliminary Injunction, dated July 13, 1976, at 21. There are several problems with this contention. First, the due process clause comes into play only when there has been a deprivation of "life, liberty, or property." The only interest of which plaintiffs have arguably been deprived is a right to bid on the DGH project without the joint venture requirement. No contract has been awarded to plaintiffs, from which a property right could be derived. As the Supreme Court stated in *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972):

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*See also Talbot v. Pyke*, 533 F.2d 331, at 332 (1976).

Second, the cases relied upon by plaintiffs have been severely restricted by more recent Supreme Court decisions, primarily *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). While the Court there distinguished the prior conclusive presumption cases, *Salfi* has been read as an attempt "to narrow the applicability of irrebuttable presumption analysis." *The Supreme Court, 1974 Term*, 89 Harv.L.Rev. 49, 82 (1975). See this court's discussion in *United States v. Friday*, 404 F.Supp. 1343, 1345–48 (E.D.Mich.1975). For a general discussion of the applicability and scope of the conclusive presumption doctrine, see Note, *The Conclusive Presumption Doctrine: Equal Process or Due Protection?*, 72 Mich.L.Rev. 800, 830 (1974) (suggesting that the doctrine is limited to cases of individual hardship).

Finally, even if there were a deprivation of property and the doctrine were otherwise applicable, plaintiffs have not correctly characterized the "presumption" underlying the CDBA resolution. The purpose of the resolution is to assure the participation of minority contractors in the DGH project; the means employed is to restrict bidding to joint ventures with at least one majority and one minority contractor. The "presumption," therefore, is that by limiting the bidding to such joint ventures, minority participation may be assured. This presumption appears to be wholly rational. The court therefore holds that plaintiffs have not demonstrated a likelihood that the due process clause has been violated.

In sum, the court finds that plaintiffs have not sustained their burden of demonstrating a likelihood of success on the merits. As to the irreparability of the threatened injury to plaintiffs, it is true that any damages would be somewhat speculative since the profits lost, if any, by failure to obtain a contract can only be estimated. However, it is difficult to consider seriously the threat of injury to plaintiffs who, as discussed above, have in large measure contributed to the problem by not attempting to comply with the joint venture requirement. It is for this reason not clear to what extent any injury will be caused by the requirement itself, as opposed to plaintiffs' own voluntary inaction. The court therefore finds that insufficient threat of irreparable injury has been shown to justify equitable relief. Finally, the court finds that the balance of harm does not weigh in favor of plaintiffs, and that the public interest will not be injured by the failure to grant injunctive relief.

For these reasons, plaintiffs' motion for a preliminary injunction is denied. An appropriate order may be submitted.