UNION COMMERCE CORPORATION, et al., Plaintiffs,

v.

HUNTINGTON BANCSHARES, INC., Defendant.

No. 82–3147.

United States District Court, N.D. Ohio, E.D.

Nov. 16, 1982.

Brian M. Eisenberg, Mark I. Wallach, Cleveland, Ohio, for plaintiffs.

Michael R. Gallagher, Cleveland, Ohio, John C. Hartranft, Columbus, Ohio, for defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

Before the Court is the motion of plaintiff, Union Commerce Corporation (UCC), for a preliminary injunction enjoining defendant, Huntington Bancshares, Incorporated (Huntington), from taking any further action in its attempt to acquire shares of UCC pursuant to its tender offer for UCC. For the reasons discussed in the following memorandum, the Court denies UCC's motion for a preliminary injunction.

### I.

This case arose out of a year-long battle for control of UCC involving Huntington and Central Bancorporation, Inc. (Central). The parties are in substantial agreement regarding most of the facts before this Court on the motion for preliminary injunction.[1] Regardless, the following findings of fact are, by necessity, preliminary in nature and are solely intended to explain the basis for the Court's order.

On December 1, 1981, Huntington entered into contracts with certain shareholders to purchase 841,316 shares of the common stock ("Common Stock") of UCC for $17 cash per share. The next day UCC received an unsolicited proposal from Huntington to acquire all of its common stock for cash and stock of Huntington. On the same date, Huntington purchased in private transactions from certain UCC shareholders 189,623 shares or 4.9% of the common stock of UCC for $17.00 cash and entered into binding contracts to purchase another 651,-693 shares or 17% at $17.00 cash, subject to regulatory approval. These purchases gave Huntington control over approximately 22% of the outstanding shares of UCC. UCC took the proposed business combination of UCC and Huntington under consideration until February 22, 1982, when it announced its rejection of the Huntington proposal. That same day Huntington filed its formal application with the Board of Governors of the Federal Reserve System (Board) for approval to acquire UCC and made clear its intention to proceed to acquire UCC through an exchange offer to UCC shareholders.

On May 10, 1982, Central, a bank holding company headquartered in Cincinnati, Ohio, with Central Trust as its lead bank, and UCC announced an agreement providing for the merger of UCC and a subsidiary of Central and also providing for a preceding cash tender offer by Central for 51% of the common and publicly-traded $2.25 Cumulative (Voting) Preferred Stock ("Preferred Stock") of UCC at $19.75. The agreement provided that each share of UCC's stock not otherwise tendered to Central pursuant to its tender offer would be exchanged in the merger for Central's debentures with a face value of $19.75.

On May 20, 1982, the Federal Reserve approved Huntington's original application to acquire up to 100% of the voting shares of UCC. On June 4, 1982, Huntington commenced a tender offer to purchase 18% of UCC stock for cash and to exchange .7 shares of Huntington stock for each share of UCC with respect to the balance of UCC shares outstanding. On June 21, 1982, Huntington purchased, in private transactions, the 17% balance of the stock first contracted for on December 2, 1981. This offer expired on July 2, 1982, after 634,021 shares were purchased for cash and 5,782 shares were exchanged for Huntington stock. Consequently, Huntington held 1,489,119 shares, or approximately 38.8% of the common stock, which represented 35.2% of all voting securities of UCC.

On June 30, 1982, Huntington announced its intention to make a tender offer of $20 per share for as many preferred shares as could be bought with the cash remaining from the expired Huntington exchange offer. On July 6, 1982, Huntington in fact commenced a tender offer for the purchase of up to 233,000 preferred shares. Central

---

1. Neither party offered any live testimony at the hearing on the motion for preliminary injunction. Instead, the parties rested almost entirely on the documents they introduced into evidence. The parties have supplied the Court with synopses of the relevant facts. The Court has drawn extensively from these submissions in drafting this opinion.

increased its offer to $22 per share, and announced both an increase in the percentage of common shares it would purchase and its intention to purchase all outstanding UCC preferred shares. The Huntington offer for UCC preferred shares was withdrawn on July 7, 1982, and no UCC preferred shares were purchased by Huntington. On July 6, 1982, Central purchased 53.4% of the Preferred Stock of UCC representing 4.9% of the voting stock, since the common and preferred vote together on certain matters, at $22.00 per share in cash.

On July 26, 1982, Huntington announced a cash tender offer (the "current offer") to purchase 875,881 shares of common and Preferred Stock at $22.50 per share in cash, and a second-step merger with an exchange rate of .77 share of Huntington common stock for each share of UCC common stock. On July 27, 1982, Central, with the approval and endorsement of UCC, amended its offer to raise its price to $25.00 per share for all the then outstanding common and Preferred Stock. Subsequently, shareholders tendered to Central approximately 58% of the common, and Central purchased or received tenders for 87% of the Preferred Stock.

On October 27, 1982, the Federal Reserve Board announced that it had granted Huntington's request to modify the terms of the Board's May 20, 1982, order approving Huntington's application to acquire UCC. The modification authorized Huntington to increase its offering price for the shares of UCC to $22.50 per share and to consummate the tender offer it commenced on July 26, 1982. At that time, Central still held approximately 58% of the common stock in its tender offer pool. The Huntington offer had been largely undersubscribed with only about 90,000 shares having been tendered up until the time of the Board approval.

The current Huntington offer does not require it to purchase any shares unless the full 875,881 shares being sought have been tendered. The current offer by Huntington also provides that for the first ten days following July 26, 1982, all shares tendered to Huntington will be prorated if the offer

was oversubscribed. That is, all shareholders tendering during such period will have the same percentage of their shares purchased for cash. Thereafter, all shares tendered will be accepted on a first-come, first-served basis.

In the Board's press release of October 27, 1982, the Board expressly stated that:

> In order to provide the shareholders of Union Commerce with full information on the status at the Board of the applications of Huntington and Central and in order to prevent any misunderstanding that might arise as a result of the Board's Bank Holding Company Act procedures, the Board has announced that it plans to make a decision whether to approve or disapprove the Central application during the week of November 8, 1982.

On the following day, October 28, 1982, UCC sent a Mailgram to all of its shareholders informing them that the Federal Reserve Board had announced that the Board "will rule on Central's application during the week of November 8." In their October 28, 1982, messages to all UCC shareholders, both UCC and Central strongly urged UCC shareholders to leave their shares on deposit with Central and not to tender to Huntington. The October 28, 1982, Mailgram from Lyman H. Treadway, Chairman and Chief Executive Officer of UCC, to all UCC shareholders, advised those shareholders that:

> *Given the Federal Reserve Board's announcement* [that it would rule on Central's application the week of November 8], *we urge you to take no action until the Federal Reserve makes its determination known."* (Emphasis in Original).

Moreover, in those same messages UCC and Central emphasized the fact that, under the terms of the Central offer, any UCC shareholder who withdrew his shares from the Central pool would not be able to re-tender into that pool and would lose the opportunity to receive $25 in cash per share. Meanwhile, both before and after the Board's October 27, 1982, approval of Huntington's offer, Huntington implored UCC shareholders to tender to Huntington and stressed

that it was highly doubtful that Central would ever receive Federal Reserve Board approval for its offer.

Moreover, the Wall Street Journal simultaneously reported that "Central's chances for getting [Federal Reserve Board] approval aren't clear. Banking observers question whether Central is financially strong enough to win Fed approval." Similarly, the choice confronting shareholders was summarized by the financial press as follows:

The Fed's decision, announced around 6:30 P.M., EDT yesterday [Thursday, October 27, 1982], gives Union Commerce holders a choice between taking Huntington's lower price for their shares, or holding out for Central's higher bid in the hopes that the Fed also will approve its application to buy Union Commerce.

Between the time of the Board's approval of the current Huntington offer on October 27, 1982, and November 12, 1982, some additional shares were tendered to Huntington, so Huntington held approximately 110,000 shares in its pool. That amount was short of the 875,881 shares needed to close the Huntington tender offer.

On Friday afternoon, November 12, 1982, at approximately 3:00 P.M., the Board of the Federal Reserve announced that it denied the application of Central, leaving the lower $22.50 current Huntington offer as the only cash offer. Huntington's common stock closed Friday, November 12, 1982, at $24.75 asked in the over-the-counter market, leaving the second-step stock merger proposal valued at only $19.05 to UCC shareholders. UCC cancelled its merger agreement with Central on Friday, November 12, 1982, and publicly announced that cancellation.

The Dow Jones Board Tape carried an announcement of the Board denial of the Central application at 3:23 P.M. on November 12, 1982. Immediately, large blocks of UCC stock were tendered to Huntington, as evidenced by Court Exhibit 1, a preliminary tabulation of the shares tendered on Friday afternoon, November 12.

A review of the "Registered Owner" column of Court Exhibit 1 demonstrates that of the 91 transactions involving tendered shares, 50 appear to be transactions involving shares which were owned by individuals or companies other than arbitrageurs and/or market professionals. With respect to the remaining 41 transactions, it is unclear whether those transactions were made on behalf of arbitrageurs or other market professionals, or whether they were tendered by brokerage houses holding shares owned by individuals or corporations in "street" name.

The Stipulation of Fact presented to the Court by all parties establishes that some holders of UCC common and Preferred Stock were not aware of the action by the Board denying the Central application prior to 5:00 P.M. on November 12, 1982. Further, it has been stipulated that some of those stockholders would have tendered their shares prior to 5:00 P.M. on November 12, 1982, if they had been aware of the Board action.

II.

Within an hour of the Board's denial of Central's application, UCC filed this action with the Clerk's Office in Cleveland. The case was assigned to this Court, but given the requirements for swift action in this case and the time required to drive from Cleveland to Akron, the motion for a temporary restraining order was heard in Cleveland by Chief Judge Frank J. Battisti. At 4:58 P.M., two minutes before the closing of Huntington's tender offer, Judge Battisti issued the temporary restraining order barring Huntington from taking any further action in its acquisition of UCC. Counsel for Huntington contacted this Court on Saturday morning and the Court scheduled a hearing on this motion for preliminary injunction for 1:30 P.M. on Monday, November 15.

At the hearing on this motion the Court heard two and a half hours of oral argument on the motion from the parties and accepted the parties' evidentiary submissions. At the conclusion of the hearing, the

Court granted UCC until noon on Tuesday to submit a brief in support of its motion.[2] Because Huntington's tender offer expires at 5:00 P.M. on Tuesday, November 16, the Court indicated that it would render its decision, with an accompanying opinion, by that time.[3]

## III.

The Court now turns to consideration of UCC's motion for a preliminary injunction. Under the applicable Sixth Circuit precedents, four factors must be considered in determining whether an injunction should be granted:

1. Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

2. Whether the plaintiff has shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977).

The four factors set out in *Mason County* may not be weighed mechanically in order to determine if the injunction should be issued. No single factor is determinative but rather the Court should weigh each of the factors in light of the factual circumstances of the case. *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537–38 (6th Cir.1978), cert. granted 440 U.S. 944, 99 S.Ct. 1420, 59 L.Ed.2d 632 (1979), cert. dismissed 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979).

**2.** During its conversation with counsel for Huntington on Saturday morning, the Court directed counsel to submit a prehearing memorandum before the Monday hearing and to advise opposing counsel to do the same. Due to a miscommunication between the parties, that message never reached counsel for UCC. The Court, therefore, granted UCC this extra time to present its position in written form.

**3.** Huntington apparently changed the closing date of its tender offer because of the continuing judicial proceedings.

In *Roth,* the Sixth Circuit held that where a strong showing of irreparable harm was made, the injunction could issue on a lesser showing of the likelihood of prevailing on the merits. *Id.* at 537–38. In a case involving great irreparable harm, for example, the injunction could issue on a showing that the plaintiff has raised questions which are "fair ground for litigation." *Id.* at 537. See also *Brandeis Machinery & Supply Corp. v. Barber-Greene Company,* 503 F.2d 503, 505 (6th Cir.1974). The showing of likelihood of prevailing on the merits required, therefore, is inversely proportional to the showing of irreparable harm made. See *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537–38 (quoting *Metropolitan Detroit Plumbing & Mechanical Contractors Association v. HEW,* 418 F.Supp. 585, 586 (E.D.Mich.1976).

Given this controlling case law, the Court will now turn to consideration of UCC's motion in light of each of these factors.

### A. *Likelihood of Success on the Merits*

■ UCC contends that Huntington's tender offer directing purchase of the shares tendered on November 12, 1982, on a first-come, first-served basis represents a violation of §§ 10(b)[4] and 14(e) of the Securities Exchange Act of 1934[5] as amended by the Williams Act.

UCC does not challenge Huntington's position that the terms of Huntington's tender offer are in accord with the specific provisions of § 14(d)(6) relating to the requirement for prorating the purchase of shares tendered during the first 10 days of a

**4.** UCC makes a number of references in its complaint and elsewhere alleging a violation of § 10(b) and Rule 10b–5. UCC has confined its argument to allegations of a violation of § 14(e). The Court, therefore, finds its conclusions with regard to UCC's allegation of a § 14(e) violation equally applicable to analysis of the § 10(b) and Rule 10b–5 claims.

**5.** All references to this Act in the opinion are to sections of the Securities Exchange Act, and not to the United States Code.

tender offer.[6] Regardless, UCC claims that the terms of Huntington's offer constitute a violation of § 14(e) of the Act, the general anti-fraud prohibition contained in the Williams Act. The precise issue raised is whether this tender offer, which complies with the requirement of § 14(d)(6) with regard to prorating the purchase of tendered shares, violates § 14(e) of the Act with regard to its prorating provisions.

Neither party has cited to the Court any other judicial decisions in which any other Court has addressed the contention made by UCC. The Court, therefore, will begin its own analysis with the relevant statutes.

In relevant part, § 14(e) prohibits "any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer...." UCC claims that the interplay of the Bank Holding Act with the provisions of the Williams Act renders the provisions of Huntington's tender offer which allowed Huntington to purchase shares tendered on a "first-come, first-serve" basis following the Board's announcement a "fraudulent, deceptive, or manipulative act or practice."[7] UCC argues that in using this provision, Huntington "knowingly created [a] set of circumstances which results in the acquisition of large blocks of stock for cash from a small group of arbitragers and market professionals either provided with or having access to superior informa-

tion ..." to the "detriment of vast numbers of UCC shareholders who were virtually powerless to act in the face of their informational disadvantage."

In sum, UCC claims that this set of circumstances set in motion by the nature of Huntington's tender offer constitutes the required "fraudulent, deceptive, or manipulative act."

The Supreme Court has described the term "manipulation" as "virtually a term of art" when used in connection with securities markets. See *Ernst & Ernst v. Stockholders,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). The term, as it is used in both Sections 10(b) and 14(e) of the Exchange Act, is pragmatically defined to prohibit and to punish the "full range of ingenious devices" that are intended to mislead investors by artificially affecting market activity. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476–77, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). The Sixth Circuit held, in *Mobil Corp. v. Marathon Oil Company,* 669 F.2d 366, 374 (6th Cir.1981), that "manipulation in securities markets can take many forms," but the common thread of the concept is: "affecting of the market for, or price of, securities by artificial means, i.e., means unrelated to the natural forces of supply and demand." The Court made it clear in *Mobil* that not only must there be a flexible approach to what

6. "Where any person makes a tender offer, request or invitation for tenders, for less than all the outstanding equity securities of a class, and where a greater number of securities is deposited pursuant thereto within ten days after copies of the offer or request or invitation are first published or sent or given to security holders than such person is bound or willing to take up and pay for, the securities taken up shall be taken up as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor. The provisions of this subsection shall also apply to securities deposited within ten days after notice of an increase in the consideration offered to security holders, as described in paragraph (7), is first published or sent or given to security holders."

Exchange Act § 14(d)(6). Huntington made this tender offer on July 26, 1982, and the ten-day proration period ended on August 4, 1982. This statute did not, therefore, bar Hunt-

ington from accepting shares on a first-come, first-served basis on November 12, 1982.

7. Under the Bank Holding Company Act of 1956, as amended, 12 U.S.C. § 1841 et seq., in order for one bank holding company to acquire over 5% of another bank holding company, prior approval of the Board of Governors of the Federal Reserve System sitting in Washington, D.C. must be obtained. The Federal Reserve has 91 days after formally accepting an application as complete to rule on such approval. As a result, bank holding company tender offers tend to be rather long, drawn-out affairs, unlike the tender offers envisioned under the Williams Act. The ten-day pro rata period prescribed by § 14(d)(6) is of little assistance to investors in these tender offers because Federal Reserve approval of the acquisition, a critical event in these tender offers, is not complete until well after the ten-day pro-rata period.

constitutes market manipulation, but that it may occur even with full disclosure of the manipulative act or device if the market has been affected by means unrelated to normal market forces.

These authorities, as cited in UCC's memorandum, only support the proposition that manipulations may occur in a wide range of factual contexts. They do not, however, provide the Court with any guidance as to whether Huntington's practices qualify as "manipulation." The Court turns to the statutory language itself in search of a definition for manipulation. In interpreting this phrase, the Court notes the effect of this combination of words in the statute. Although the word "manipulative" is subject to a range of interpretation, the Court believes that this word should be interpreted in context with the words "fraudulent" and "deceptive." Taken in this context, the Court is not persuaded that the prorating provisions of Huntington's tender offer constitute, as UCC would contend, a manipulative practice under the terms of the act. The Court is not persuaded that § 14(e), which prohibits "fraudulent, deceptive, or manipulative acts or practices," should be interpreted to prohibit Huntington's conduct, which complies with the precise terms of § 14(d)(6).

The leading Sixth Circuit decision on the definition of "manipulative" in this context, *Mobil Corp. v. Marathon Oil Company,* 669 F.2d 366 (6th Cir.1981), is in accord with this interpretation. In *Mobil,* the Court ruled that Mobil had shown some likelihood that it could establish that Marathon's grant of certain options to another bidder in this takeover battle "had the effect of creating an artificial price ceiling in the tender offer market for Marathon common shares, and that the options therefore are "manipulative acts or practices" in connection with a tender offer in violation of § 14(e). *Id.* at 375. Unlike the case at bar, *Mobil* involved a challenged practice which was not governed by any precise provision of the Exchange Act. In this case, the prorating provisions of Huntington's tender offer, which constitute the alleged violation, are specifically regulated by § 14(d)(6). The

Sixth Circuit's holding in *Mobil,* therefore, is distinguishable from this case.

UCC cites to a proposed Securities & Exchange Commission rule which would require pro rata acceptance of securities that are the subject of a tender offer during the entire period a tender offer remains open as authority supporting its view. See Exchange Act rel. No. 18761, [current] *Fed. Sec.L.Rep.* (CCH) ¶ 83,222 at 85,140 (May 25, 1982). The Court does not find that this authority is persuasive. Proposed rules do not have the force of law. In fact, the SEC's proposal of rules which would accomplish the same results urged by UCC in this matter supports the position that the existing law does not support UCC's legal theory in this case.

In light of these authorities, the Court is not persuaded by UCC's contention that the prorating provisions of Huntington's tender offer constitute a violation of § 14(e). The Court, therefore, finds it highly unlikely that UCC will prevail at a trial on the merits.

### 2. *Irreparable Injury to UCC*

■ UCC contends that the failure to provide preliminary relief in this matter will make it impossible for a Court to grant permanent relief at a later date. In support of this contention, UCC properly notes that it will be impossible for the Court to undo the tender offer at a later date after the shares have changed hands. The Court recognizes the strength of this familiar argument but notes an important factual distinction that mitigates its power in this case. UCC has repeatedly acknowledged in this proceeding that its acquisition by Huntington will take place regardless of the Court's decision in this matter. The only question, therefore, is the apportionment of the proceeds of sale. Unlike the situations cited by UCC, a Court which would later find a violation in Huntington's offer, would not be faced with the task of reconstituting UCC. In light of this analysis, the Court finds that UCC has made a significant, but not exceptionally strong, showing of irreparable harm.

### 3. *Harm to Others*

In its prehearing memorandum, Huntington argues that "if even the 10-day injunction sought by UCC is granted, the interim damage to Huntington and to Union Commerce shareholders may be devastating." Prehearing Memorandum of Defendant at 12. Huntington has not fully developed the factual predicate underlying this assertion, but apparently Huntington believes that UCC would use this additional time to take further action to block the tender offer. Given the parties' representation to the Court that it takes at least 90 days to get Federal Reserve Board approval of a takeover of a bank holding company, the Court does not find this to be a particularly persuasive argument. Regardless, the vast array of defensive devices that remain open to a target company in a tender offer context renders Huntington's concerns not entirely groundless. In this light, the Court finds at least minimal harm to others that would result from its issuance of an injunction in this matter.

### 4. *The Public Interest*

Huntington raises the argument that the issuance of an injunction "will create substantial doubt and confusion as to the direction of UCC's operations which can only be of harm ... to the communities that UCC serves." Prehearing Memorandum of Defendant at 14. This argument recognizes the fact that, at least for the present, UCC does not have a clear owner. UCC responds by noting a competing public interest in encouraging equal access to securities markets. UCC's argument, however, fails to address the fact that Huntington will eventually control UCC. The only question before the Court at this time is the distribution of the cash component of the Huntington tender offer. This case, therefore, becomes a matter of dispute only between two different classes of UCC shareholders over this money. No one contends that Huntington should not receive control of UCC. An injunction, however, would have the effect of leaving control of UCC undecided. Current UCC management would maintain control in the short term. Huntington would have control in the long term period. This separation of short and long term control of UCC can only have a negative effect upon the operations of UCC and upon the public in general and therefore suggests that an injunction would possibly jeopardize the public interests with very few, if any, compensating benefits.

### IV.

In conclusion, the Court finds that it is highly unlikely that UCC will prevail at a trial on the merits, that it has shown a significant, but not strong, likelihood of irreparable harm, and that Huntington has shown some harm that would befall it and the public in general by the issuance of an injunction. In light of these findings, the Court, in its discretion, finds that this is an inappropriate situation for the award of preliminary relief. Accordingly, the motion for a preliminary injunction is denied, and the temporary restraining order is dissolved.

IT IS SO ORDERED.