David INGRAM, Plaintiff,

v.

TOLEDO CITY SCHOOL DISTRICT
BOARD OF EDUCATION, et
al., Defendants.

No. 3:04 CV 7561.

United States District Court,
N.D. Ohio,
Western Division.

Oct. 15, 2004.

---

Thomas J. Zraik, Sylvania, OH, for Plaintiff.

## MEMORANDUM OPINION

KATZ, Judge.

This matter is before the Court on Plaintiff's second Motion for a Temporary Restraining Order ("TRO") and a Preliminary Injunction ("Injunction"). (Doc. No. 15).[1] Defendants Ohio High School Athletic Association ("OHSAA") and Daniel Ross, Ph.D. ("Ross") have filed responses. Defendant Toledo Public Schools ("TPS") has not responded in writing. The Court has jurisdiction over this matter under 28 U.S.C. §§ 2201 and 2202. For the reasons stated hereafter, Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction is granted.

### BACKGROUND

Plaintiff David Ingram ("Ingram") is an eighteen-year-old Start High School ("Start") senior who hopes to get a football scholarship to a university. Start is a public high school and a part of Defendant TPS. Ingram has been diagnosed with a "specific learning disability" in the areas of reading, reading comprehension, and math

concepts. As required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C §§ 1400 *et seq.*, Toledo Public Schools has developed for Ingram, each year since he was in third grade, an "Individualized Education Plan" ("IEP") in order to provide him with a "free appropriate public education" ("FAPE").

The OHSAA is a voluntary, private organization of Ohio high schools, of which Start is a member. The OHSAA regulates the eligibility of students at member schools to participate in interscholastic sports competition. Member schools are bound by OHSAA Rules and Bylaws.

To be eligible, OHSAA Bylaw 4–4–1 requires student athletes to achieve passing grades in at least five core classes in the quarter immediately preceding the period of eligibility. High school semesters consist of two quarters, each of which count forty percent toward a student's semester grade, and a final exam, which is independent of each of the quarters and counts twenty percent toward the semester grade. The OHSAA keys eligibility for extramural sports to students' grades for the preceding quarter, regardless of the grade received on the final exam or for the semester as a whole.

Bylaw 4–4–6 prohibits "[s]ummer school and other educational options" from being used "to substitute for failure to meet the academic standards specified by Bylaw 4 during the last grading period of the year." The OHSAA interprets this rule to bar the use of make-up work to change a failed quarter grade and make a student eligible. The lone express exception to this interpretation is Bylaw 4–4–7, which states, "[t]utoring or examinations to complete the preceding grading period re-

---

1. Plaintiff's motion is captioned as a motion for a TRO only, however, by the consent of the parties the Court will construe the motion as a combined motion for a TRO and a preliminary injunction.

quirements is permissible provided the inability to complete the required work on time is due to illness or accident verified by a physician and the procedure applies to all students in the school." Under OHSAA Sports Regulation 28, a school must forfeit "an athletic contest in which the winner is determined to have used an ineligible participant."

David Ingram enrolled in only five classes during the second semester of his junior year, necessitating that he receive passing fourth quarter grades in all of them to remain eligible to play football in the fall of his senior year. In the fourth quarter of junior English, despite prodding from his tutor, offers of help from his English teacher, and an interim report, dated May 5, 2004, which was sent to his home, indicating that he was "in danger of failing" due to "incomplete homework or class assignments," Ingram failed to turn in nine out of twenty-five assignments, including an essay he knew he was required to complete in order to pass the quarter. This resulted in Ingram failing the fourth quarter of English.

Ingram took his English final exam without any of the testing accommodations provided for in his IEP, which allowed him to take tests with his tutor, with extended test time, restated directions, and access to a calculator and a dictionary. He did not complete the essay portion of the exam and answered fifty-two out of eighty-five objective questions correctly. He also failed the exam.

Ingram did not receive his grade card at the end of the school year because he owed fees to the school. Neither Ingram nor his mother inquired about his final grades. Therefore, Ingram was unaware that he failed the fourth quarter of junior English and the final exam. He practiced with the football team, and only learned he had failed the fourth quarter of English and

was ineligible to play when his tutor, John Dougherty ("Dougherty"), called to inform him of this in early August.

On September 2, 2004, Start let Ingram retake the English final exam under the terms of his IEP. Ingram studied with Dougherty before the test and earned a "B minus." This, coupled with his passing third-quarter grade, gave him a passing grade for the semester. Though this did not, by itself, affect Ingram's football eligibility, Ingram claimed his English teacher had promised him that she would change his fourth quarter "F" to a passing grade if he passed the final exam, and that his new, passing grade coupled with his teacher's "promise" made him eligible to play football. His teacher denied making such a promise.

Ingram asked this Court to issue a TRO barring Start and TPS from precluding him from playing football until the results of the due process hearing Ingram requested under 20 U.S.C. §§ 1415(b)(6) and (f) to "contest [Start's] failure to implement David's IEP and to question his ineligibility for sports" were known. Ingram's motion focused on Start's failure to provide testing accommodations as provided by the IEP, rather than on the School's actions regarding the implementation of his IEP in the fourth quarter or the handling of his failure to turn in his missing fourth quarter assignments.

This Court denied Ingram's motion, finding Ingram had not shown a strong likelihood of success on the merits, in that his IEP provided for testing accommodations "as needed" and Ingram had not requested them, and further finding the TRO could significantly harm others if Start was forced to forfeit games the games in which Ingram played if he was ultimately unsuccessful. (Doc. No. 12).

The due process hearing was held on September 21, 2004, before an Impartial Hearing Officer ("IHO"), who rendered his decision on September 27, 2004. The IHO heard testimony and evidence similar to that before this Court, but also heard additional testimony not heard by this Court. Particularly of interest to the IHO and, at the present stage, to this Court, is the English teacher's failure to understand the extent of Ingram's IEP and her responsibilities and the school's pursuant thereto, as well as the school's failure to live up to recommendations made in Ingram's Multi-Factored Evaluation ("MFE"), which was referenced in his IEP. Focusing on Start's response to Ingram's failure to complete his fourth quarter assignments, the IHO found that Start "failed to implement the student's IEP ... whereby modifications as required under the IEP where [sic] not provided to the student, resulting in an F for the fourth quarter English class." (Doc. No. 14, Sec. Amd. Comp., Ex. 2, IHO Dec., p. 8–9).

Specifically, the IHO found Ingram's MFE of June 2003 stated Ingram would benefit from scheduled meetings with his tutor, responded well to "small group and individualized instruction," needed "a modified curriculum that is designed to establish an appropriate instructional level for him in the area of reading," and "would benefit from regular, consistent communication between the student's teachers, LT [tutor] and his parent regarding his educational progress." *Id.* at 3. The IHO noted Ingram's IEP provided that he would " 'take all regular classes and will work with a tutor to complete all work' " on an " 'as needed' " basis. *Id.* The IHO concluded:

> [C]ontrary to the dictates of the MFE in place, the student did not receive regular, consistent communication between his teachers, LT and parent regarding his education; a modified curriculum was not established in the area of reading; his meetings with the LT were on an "as needed basis" rather than scheduled; and no small groups or individual instruction were arranged.

*Id.* at 10 (internal citation omitted).

Additionally, faced with Ingram's lack of motivation to complete his assignments, the IHO found that Start "failed to confront the situation and should have at least called an IEP meeting to discuss the student's academic situation." *Id.* at 11. Despite the fact that "[t]he evidence at the hearing does support that the student failed to take advantage of what was available," the IHO found that "[r]equiring the SLD [specific learning disability] student to request services before the school takes action is contrary to the meaning and intent of the IDEA," and that "[t]he law does not place the burden on the SLD student to seek academic modifications when an IEP is in place." *Id.* at 12. Essentially, the IHO found that while David Ingram bore significant responsibility for his failure to turn in assignments in English, the school and the professionals charged with ensuring Ingram received a FAPE were more culpable for failing to properly implement Ingram's IEP.

The IHO therefore ordered Start to convene an IEP meeting; to permit Ingram to make up the missed fourth quarter English assignments "with assistance from his tutor according to the modifications that are in place within the student's current IEP"; and to reevaluate Ingram's football eligibility once he had submitted the assignments and passed the fourth quarter. (Doc. No. 14, Sec. Amd. Comp., Ex. 2, IHO Dec., p. 9). TPS has chosen to comply with the IHO's order and not to exercise its option to appeal the IHO's decision.

Start has scheduled an IEP meeting and has allowed Ingram to make up the work, which he has completed. Start graded the assignments and determined Ingram's fourth quarter English grade is now a "D," giving him a grade point average of 1.16. This means, though Ingram is on academic probation under TPS's academic eligibility policy, he meets the academic requirements to be eligible to play football in the present quarter.

However, Ingram is ineligible to play under the OHSAA "no make-up work" interpretation of Bylaw 4-4-6. The OHSAA has indicated to this Court that it will not grant Start and Ingram a waiver of Bylaw Section 4. Start therefore risks the imposition by the OHSAA of the forfeiture penalty for the use of an ineligible player if it allows Ingram to play.

Ingram has joined the OHSAA and its commissioner as defendants and filed a new motion for an Injunction barring the OHSAA and TPS from keeping Ingram off the field and prohibiting the OHSAA from sanctioning the latter through forfeiture of games in which Ingram plays.

## DISCUSSION

### A. Preliminary Injunction Standard

Under Fed.R.Civ.P. 65, injunctive relief is an extraordinary remedy whose purpose is to preserve the status quo. Injunctive relief may be granted to effect preventative or protective relief. The factors considered in granting a TRO are similar in nature to those relating to a preliminary injunction. In the Sixth Circuit it is well settled that the following factors are to be considered in determining whether to grant preliminary injunctive relief:

(1) Whether the movant has shown a strong or substantial likelihood or probability of success on the merits; (2) Whether the movant has shown irreparable injury; (3) Whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) Whether the public interest would be served by granting injunctive relief.

*See Mason County Med. Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). The Sixth Circuit advocates a balancing approach as to these factors:

It thus appears that the precise wording of the standard for the likelihood of success on the merits is not as important as a realistic appraisal of all of the traditional factors weighed by a court of equity. A balancing is required, and not the mechanical application of a certain form of words.

*Roth v. Bank of the Commonwealth,* 583 F.2d 527, 537-38 (6th Cir.1978) (quoting *Metro. Detroit Plumbing & Mech. Contractors Ass'n v. HEW,* 418 F.Supp. 585, 586 (E.D.Mich.1976)), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979); *see also In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985).

The degree of proof necessary for each factor used in determining whether to grant preliminary injunctive relief depends on the strength of plaintiff's case on other factors. *See Golden v. Kelsey-Hayes Co.,* 73 F.3d 648, 657 (6th Cir.), *cert. denied,* 519 U.S. 807, 117 S.Ct. 49, 136 L.Ed.2d 13 (1996). The party seeking the injunctive relief carries the burden of persuasion on the above stated factors. *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir.1978).

### B. Likelihood of Success on the Merits

Ingram has shown a strong likelihood he will succeed on the merits.

At the outset, it must be noted that TPS has chosen not to appeal the IHO's decision, though it has the right to do so under the IDEA. *See* 20 U.S.C.

§ 1415(i)(1)(A). The IHO's decision is therefore final and binding on TPS. *Id.* By scheduling an IEP meeting, allowing and grading the make-up work, and reevaluating eligibility, TPS and Start have complied fully with the IHO's order. This Court is therefore not being asked to review or to enforce the IHO's decision.[2] Rather, the issue at hand is whether, in light of the IHO's final and binding decision and Ingram's passing score in fourth quarter English, Start, TPS, and the OHSAA may preclude Ingram from playing football this quarter, or whether an exception must be made to the eligibility rules in this case.

To the extent the OHSAA interprets its rule to require forfeiture by Start if Ingram plays, the Court finds the interpretation unreasonable. Where a student completes make-up work because an independent, final, and binding order has been issued stating that the student's school failed to implement properly the student's IEP, and the student is deemed by the school, on the basis of the make-up work, to have passed the quarter the student had previously failed, OHSAA Bylaw 4–4–6 prohibiting the use of "[s]ummer school or other educational options" as substitute fourth quarter grades should not be interpreted to render the student ineligible. Rather, the exceptions to the "no make-up

work" rule for circumstances beyond the student's control such as illness or accident should include situations in which an independent, final, and binding finding declares the student's initial failure of a class was caused by the failure of the student's school to implement properly the student's IEP, and the student has made up work, leading to a passing grade for the quarter at issue.

The OHSAA has directed the Court's attention to the opinion of the United States District Court for the Southern District of Ohio in *Kitts v. Ohio State High Sch. Athletic Ass'n,* No. C–2–96–854 (S.D.Ohio Sept. 6, 1996). In the *Kitts* case, the school permitted three students who had each failed one of the four classes OHSAA Bylaw 4–4–1 then required students to pass to be eligible to take those classes in an "extended" school year setting akin to summer school. *Kitts,* No. C–2–96–854, slip op. at 1–4. When the students passed, the school and the students asserted that the grades for the extended school year should be substituted for the original grades "because the prior grades did not properly take into account the students' handicapped condition." *Id.* at 3–4. The OHSAA refused on the basis of Bylaw 4–4–6, which prohibits summer school grades from being "substituted for

---

2. The Court notes that were it to review the IHO's decision, it would "undertake a 'modified *de novo* review' of the administrative decision." *Berger v. Medina City Sch. Dist.,* 348 F.3d 513, 519 (6th Cir.2003) (quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). This standard requires a district court to:

[M]ake an independent examination of the evidence and base its decision on a preponderance of the evidence contained in the complete record, while giving "due weight" to the factual findings made in the state administrative proceedings; particularly when educational expertise is essential to those findings.

*Id.* Moreover:
[A]dministrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both.
*Burilovich v. Bd. of Educ.,* 208 F.3d 560, 567 (6th Cir.2000).
Applying this standard, this Court would find the IHO's decision reasonable, given the additional facts the IHO had before him.

failing grades from the last grading period of the regular school year." *Id.* at 2–4.

In a well-reasoned opinion, the late Judge Joseph P. Kinneary rejected the students' and school's request to create an exception to Bylaw 4-4-6 based on their position that such was required as a reasonable accommodation to the needs of handicapped students. Judge Kinneary concluded:

> This school year [the "regular" school year] can include an "extended school year" in appropriate cases, such as where an IEP is devised before a student's pending ineligibility is discovered. It cannot include, however, a program that allows schools to replace students' failing grades with passing grades at a later date. Such a change would be a waiver of 4-4-6, an essential requirement. It would not be reasonable.

*Id.* at 9.

The *Kitts* case is distinguishable from the case at bar. In this case Start did not voluntarily "extend" the school year. Rather, subsequent to the hearing conducted by this Court on September 14, 2004, an IHO conducted a "due process" hearing at which he considered testimony and evidence similar to that before this Court, as well as significant additional testimony not heard by this Court. Based upon that additional testimony as well as the record of this Court's hearing, the IHO determined that, while David Ingram bore significant responsibility for his failure to turn in assignments in English, the school was more culpable for failing to properly implement Ingram's IEP. The IHO ordered Start to permit Ingram to make up the missed assignments, have them graded, and, if he passed the English course, to determine his eligibility to play football.

Unlike the school in *Kitts*, the school here has been found by an IHO to have failed to properly implement the student's IEP. That failure can be viewed to be a situation not within the control of the student, Ingram, similar to "illness or accident" as described in Bylaw 4-4-7, which permits a student to complete missed work after the preceding grading period. Like the physician's verification required by Bylaw 4-4-7, the independent decision of the hearing officer prevents schools from abusing the exception, a chief concern in *Kitts*. *Kitts*, No. C-2-96-854, slip op. at 11.

Moreover, the fact that, as this Court found previously and as the IHO acknowledged, David Ingram contributed significantly to his own initial failure of fourth quarter English has no effect on the unreasonability of the OHSAA's attempt to find him ineligible under the present circumstances. The OHSAA allows students to earn their eligibility through make-up work when their initial failure was due to illness or accident, whether or not the student contributed to that illness or accident by, for example, standing outside in the cold and rain, performing a risky maneuver on a skateboard, or negligently driving an automobile. The same standard should apply to a student, like Ingram, when an IHO verifies that the student's initial failure was caused by the school's failure to implement properly the student's IEP, regardless of whether the student also contributed in part to that failure.

This Court concludes that the findings and order of the IHO are reasonable and binding on the defendant school and TPS. Because the IHO found the defendant school more culpable than the plaintiff and therefore guilty of failing to properly implement the IEP, the Court finds that the Plaintiff's failure of fourth quarter English, which resulted in his ineligibility for football, to be a situation beyond Ingram's control and similar in kind to the illness or accident situation justifying an extended

school year under Bylaw 4–4–7. In this unique situation, it is unreasonable for the OHSAA not to permit the school to comply with an order of an IHO and not to grant a waiver allowing the student to play football in the present quarter.

Because counsel for the OHSAA has advised the Court that the OHSAA will not grant a waiver to Start and Ingram if the matter were appealed to the OHSAA, the Court further finds it would be futile for Ingram to so appeal, and the lack of such an appeal does not preclude this Court from ruling on the matter before it.

Based on the foregoing, the Court finds Ingram has shown a strong likelihood of succeeding on the merits of his claim.

### C. Irreparable Injury

■ Ingram has received letters from at least a dozen colleges expressing admiration for his talents on the gridiron and inviting him to recruitment workshops. As the Court previously stated, Ingram's performance on the field this year, if he is allowed to play, could be a factor leading to an offer of an athletic scholarship to college, and, conversely, it is acknowledged that Ingram will have little chance of attending college other than on an athletic scholarship.

The Court's prior analysis of the potential injury to Ingram should the Injunction not issue is tempered by the additional evidence elicited at the due process hearing relating to the comparative fault of the parties, including the evidence regarding Ingram's teacher's lack of familiarity with his IEP and the school's failure to act in accordance with Ingram's MFE.

Moreover, when the Court last considered the harm to Ingram, he risked missing two football games in the time between this Court's decision and the decision of the IHO. At the present time, three games

remain in Ingram's senior football season. He has sat out the balance of the season due, at least in part, to the failure of Start High School to implement properly his IEP, an oversight over which Ingram had no control.

Based on the foregoing, the Court finds this factor weighs in favor of Ingram.

### D. Substantial Harm to Others

■ Judge Kinneary, in *Kitts*, considering the OHSAA bylaws under a handicap discrimination framework, identified several causes for concern were the OHSAA to be enjoined from enforcing its rules under the facts in *Kitts*. Because the facts here differ, the case at bar does not raise such concerns, and the Court finds that there is no likelihood an injunction in this case will cause substantial harm to others, including the OHSAA.

Allowing an exception to Bylaw 4–4–6 when an IHO determines a student failed because the student's school failed to implement properly the IEP does not, as did the proposed exception for post-failure diagnosis of a disability in *Kitts*, change the inherent nature of Bylaws 4–4–1 and 4–4–6. *Kitts*, No. C–2–96–854, slip op. at 7–8. In *Kitts*, Judge Kinneary felt such an exception would be tantamount to "wiping 4–4–6 off the slate." *Id.* at 8. In contrast, here the proposed exception for failure to implement a pre-failure IEP goes no further in principal than the exception for illness or accident already embodied in Bylaw 4–4–7. The exception therefore "maintains the inherent nature of" the Bylaws. *See id.*

Likewise, because the exception required here only operates when an IHO has determined the school has failed the student, no such individual determination, with its attendant costs, need be made by the OHSAA, as would have been the case in *Kitts*, where the OHSAA would have

been required to investigate the nature of each school's summer program individually. *See id.* at 9.

*Kitts'* chief concern appears to have been the potential for abuse of the exception by schools and athletes. *Id.* at 11. Here, no such harm will come to the OHSAA and its member schools, because an independent verification of the school's failure to serve a student must be made by an IHO.

Based on the foregoing considerations, the Court finds no likelihood of substantial harm to the OHSAA or its member schools, including Start and other TPS schools.

## E. Public Policy

■ Public policy considerations, while they do not drive the Court's opinion in this case, favor Ingram.

The purpose of the OHSAA Bylaws is to serve the public interest by ensuring academics remains the top priority in Ohio high schools, and is not subjugated to athletics. As Judge Kinneary explained, "[t]he restriction on amended grades ... promotes academic integrity and uniform treatment of athletes and non-athletes within a school because history shows that athletes are more likely to get special treatment." *Kitts,* No. C–2–96–854, slip op. at 7. Unlike in *Kitts,* where the court was concerned with schools abusing the rules and giving athletes special treatment, counting Ingram's make-up work, completed under the conditions his IEP stated he required, does not amount to special treatment, but rather helps ensure Ingram is evaluated for eligibility on a level playing field with non-disabled students.

Moreover, as this Court previously noted, the public interest is never served when a young person's potential is wasted. While the public interest is likewise not benefitted when young people are led to believe that rules do not apply to them, the public interest is served above all when equity, fairness, and substantial justice are served. Here, in consideration of the balance of culpability found by the IHO after consideration of additional evidence not before this Court at the September 14, 2004 hearing, the Court finds the public interest best served when an exception to the eligibility rules is made where an independent determination has been made that the student's failure was precipitated by a failure of the school.

## F. Balancing the Factors

Balancing the foregoing factors, the Court finds the equities weigh in Ingram's favor. Accordingly, the Court will issue a preliminary injunction ordering Start High School and TPS to permit David Ingram, at his coach's discretion, to play interscholastic football in the present quarter. The Court will further issue a preliminary injunction to prevent the OHSAA from enforcing its forfeiture penalty against Start High School or TPS for allowing Ingram to play, and/or to grant Start and Ingram a waiver of Bylaw 4.

### CONCLUSION

Accordingly, Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction (Doc. No. 15) is granted. The Court determines no bond is needed. Start High School and TPS shall permit David Ingram, at his coach's discretion, to play interscholastic football in the present quarter. The OHSAA is enjoined from enforcing its forfeiture penalty against Start High School or TPS for allowing Ingram to play, and/or shall grant Start and Ingram a waiver of Bylaw 4, allowing Ingram to play interscholastic football in the present quarter without forfeiture by Start.

IT IS SO ORDERED.

## JUDGMENT ENTRY

KATZ, District Judge.

For the reasons stated in the Memorandum Opinion filed contemporaneously with this entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that

FURTHER ORDERED that Start high School and TPS shall permit David Ingram, at his coach's discretion, to play interscholastic football in the present quarter.

FURTHER ORDERED that the OHSAA is enjoined from enforcing its forfeiture penalty against Start High School or TPS for allowing Ingram to play, and/or shall grant Start and Ingram a waiver of Bylaw 4, allowing Ingram to play interscholastic football in the present quarter without forfeiting by Start.

FURTHER ORDERED that no bond need be posted.